893 F.2d 693
 22 Collier Bankr.Cas.2d 500, 20 Bankr.Ct.Dec. 68
 In the Matter of CLARK PIPE AND SUPPLY CO., INC., Debtor.
Claude R. SMITH, as Trustee for the Debtor, Clark Pipe and
Supply Co., Inc., Appellee,
v.
ASSOCIATES COMMERCIAL CORPORATION, Appellant.
 No. 88-3376.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 24, 1990.
Rehearing and Rehearing En Banc Denied Jan. 24, 1990.
 
 Rex E. Lee, Washington, D.C., Richard W. Bussoff, Linton W. Carney, Jr., Monroe & Lemann, New Orleans, La., for appellant.
 Philip K. Jones, Jr., Liskow & Lewis, New Orleans, La., for appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 ON SUGGESTION FOR REHEARING EN BANC
 (Opinion April 25, 1989, 5 Cir., 1989, 870 F.2d 1022)
 Before POLITZ and JOLLY, Circuit Judges, and HUNTER*, District Judge.
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 Treating the suggestion for rehearing en banc filed in this case by Associates Commercial Corporation ("Associates"), as a petition for panel rehearing, we hereby grant the petition for rehearing. After re-examining the evidence in this case and the applicable law, we conclude that our prior opinion was in error. We therefore withdraw our prior opinion and substitute the following:[1]
 
 
 2
 In this bankruptcy case we are presented with two issues arising out of the conduct of the bankrupt's lender during the ninety days prior to the bankrupt's filing for protection from creditors. The first is whether the lender improved its position vis-a-vis other creditors during the ninety-day period and thus received a voidable transfer. If so, the second question is whether the lender engaged in such inequitable conduct that would justify subordination of the lender's claims to the extent that the conduct harmed other creditors. Since we decide that equitable subordination is an inappropriate remedy in this case, we need not decide whether avoiding the transfer and equitable subordination are duplicative or complementary remedies.
 
 
 3
 * Clark Pipe and Supply Company, Inc., ("Clark") was in the business of buying and selling steel pipe used in the fabrication of offshore drilling platforms. In September 1980, Associates and Clark executed various agreements under which Associates would make revolving loans secured by an assignment of accounts receivable and an inventory mortgage. Under the agreements, Clark was required to deposit all collections from the accounts receivable in a bank account belonging to Associates. The amount that Associates would lend was determined by a formula, i.e., a certain percentage of the amount of eligible accounts receivable plus a certain percentage of the cost of inventory. The agreements provided that Associates could reduce the percentage advance rates at any time at its discretion.
 
 
 4
 When bad times hit the oil fields in late 1981, Clark's business slumped. In February 1982 Associates began reducing the percentage advance rates so that Clark would have just enough cash to pay its direct operating expenses. Clark used the advances to keep its doors open and to sell inventory, the proceeds of which were used to pay off the past advances from Associates. Associates did not expressly dictate to Clark which bills to pay. Neither did it direct Clark not to pay vendors or threaten Clark with a cut-off of advances if it did pay vendors. But Clark had no funds left over from the advances to pay vendors or other creditors whose services were not essential to keeping its doors open.
 
 
 5
 One of Clark's vendors, going unpaid, initiated foreclosure proceedings in February and seized the pipe it had sold Clark. Another attempted to do so in March. The resulting priority dispute was resolved only in litigation. See Mitsubishi International Corp. v. Clark Pipe & Supply Co., 735 F.2d 160 (5th Cir.1984), and In the Matter of Clark Pipe, Inc. Debtor, 759 F.2d 19 (5th Cir.1985) (Mitsubishi International Co.; Interpipe, Inc.; Nichimen Co., Inc.; and Berg Steel Pipe Corp., all pipe vendors, and the Walworth Co., Inc., a valve vendor, had valid vendors' privileges in the goods they had sold Clark that, under Louisiana law, primed Associates' inventory mortgage). When a third unpaid creditor initiated foreclosure proceedings in May, Clark sought protection from creditors by filing for reorganization under Chapter 11 of the Bankruptcy Code.
 
 
 6
 The case was converted to a Chapter 7 liquidation on August 31, 1982, and a trustee was appointed. In 1983, the trustee brought this adversary proceeding against Clark's lender, Associates. The trustee sought the recovery of alleged preferences and equitable subordination of Associates' claims. Following a one-day trial on August 28, 1986, the bankruptcy court entered judgment on April 10, 1987, and an amended judgment on June 9, 1987. The court required Associates to turn over $370,505 of payments found to be preferential and subordinated Associates' claims. The district court affirmed on May 24, 1988. 87 B.R. 21.
 
 II
 
 7
 * The first issue before us is whether the bankruptcy court was correct in finding that Clark, by selling its inventory and thereby converting the inventory to accounts receivable that had been assigned to Associates, made a preferential transfer to Associates that should be avoided in accordance with sections 547(b) and (c)(5) of the Bankruptcy Code. Under section 547(c)(5),[2] a voidable preferential transfer occurred if Associates improved its position over the ninety-day period between February 5 and May 7 to the prejudice of unsecured creditors.[3]
 
 
 8
 In order to determine whether Associates improved its position during the ninety-day preference period, we must apply the test we adopted in Matter of Missionary Baptist Foundation of America, Inc., 796 F.2d 752, 760 (5th Cir.1986) (Missionary Baptist II ):
 
 
 9
 The "two-point net improvement" test of Section 547(c)(5) requires ... a computation of (1) the loan balance outstanding ninety days prior to the bankruptcy; (2) the value of the [collateral] on that day; (3) the loan balance outstanding on the day the bankruptcy petition was filed; and (4) the value of the [collateral] on that day.
 
 
 10
 By comparing the loan balance minus the value of Associates' collateral on February 5 with the loan balance minus the value of Associates' collateral on May 7, it can be determined whether Associates improved its position during the ninety-day period. The loan balances on February 5 and May 7 are not at issue here. The dispute concerns the value to be assigned the collateral.
 
 
 11
 Associates argues that in valuing the inventory, the bankruptcy court should have employed the going-concern method of valuation rather than the liquidation method. Associates contends that because the bankruptcy court employed the wrong valuation method, it found a preference where there was none. Moreover, Associates contends that even if the liquidation method is appropriate here, the bankruptcy court improperly viewed the value of inventory from the debtor's perspective rather than the creditor's perspective, and subtracted out operating costs of Clark bearing no relation to the liquidation of inventory. Finally, Associates argues that because the bankruptcy court failed to give reasons for its choice of valuation method, and the district court merely affirmed the bankruptcy court without discussing the valuation question, we must reverse and remand.
 
 B
 
 12
 We consider first whether the record is sufficiently complete to permit review in the absence of precisely articulated reasons for the actions of the bankruptcy court. In Missionary Baptist II we remanded, finding the record unreviewable because, in applying section 547(c)(5), the bankruptcy judge had not given specific reasons for his choice of valuation method. 796 F.2d at 761-62. Viewing this record as a whole, however, we conclude that it is adequate for purposes of review. In its Conclusions of Law, the bankruptcy court rejected Associates' argument that going-concern value should be used in determining the value of the collateral and explicitly accepted the expert testimony offered by the trustee that liquidation value should be used. That expert testimony contained reasons in support of its conclusion. Thus, we conclude that the bankruptcy court adopted the reasoning of the trustee's expert, and therefore we cannot say that the case must be remanded before we can properly review it on appeal.
 
 C
 
 13
 Having concluded that the record is reviewable, we must examine the record to determine whether the bankruptcy court adopted the appropriate method of valuing the collateral. The Code does not prescribe any particular method of valuing collateral, but instead leaves valuation questions to judges on a case-by-case basis. See H.R.Rep. No. 595, 95th Cong. 1st Sess. 216, 356 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6176, 6312. Valuation is a mixed question of law and fact, the factual premises being subject to review on a "clearly erroneous" standard, and the legal conclusions being subject to de novo review. In re Ebbler Furniture and Appliances, Inc., 804 F.2d 87, 89 (7th Cir.1986); Matter of Missionary Baptist Foundation of America, 712 F.2d 206, 209 (5th Cir.1983) (Missionary Baptist I ). Associates' collateral consisted of inventory and receivables. Since the parties stipulated the value of the accounts receivable, the sole issue was the value of the inventory.
 
 
 14
 The bankruptcy court adopted the view of the trustee's expert that Clark was in the process of liquidation throughout the ninety-day period from February 5 to May 7. This finding of fact was not clearly erroneous. Thus, for purposes of determining whether Associates improved its position at the expense of other creditors during that period, we conclude that the liquidation method of valuing the collateral was proper at both ends of the preference period.
 
 
 15
 Associates maintains that even if the liquidation method is appropriate in this case, the bankruptcy court improperly valued inventory from the perspective of the debtor (Clark), rather than the creditor (Associates). Moreover, Associates contends that in valuing the inventory, the bankruptcy court erroneously deducted all of Clark's corporate expenses, including general overhead.
 
 
 16
 We agree with Associates that the bankruptcy court erroneously valued inventory from the perspective of the debtor rather than the creditor. The "ultimate goal" of the improvement in position test is to "determine whether the secured creditor is in a better position than it would have been had bankruptcy been declared ninety days earlier." Cohen, Value Judgments: Accounts Receivable Financing and Voidable Preferences Under the New Bankruptcy Code, 66 Minn.L.Rev. 639, 663-64 (1982) (emphasis added); H.R.Rep. No. 595, 95th Cong., 1st Sess. 216, 374 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 6176, 6330 ("A creditor ... is subject to preference attack to the extent he improves his position during the 90-day period before bankruptcy."); see also Missionary Baptist II, 796 F.2d at 761. Cases that have addressed the valuation of inventory in the "improvement in position" test have repeatedly focused on value in the hands of the creditor. See, e.g., In re Ebbler Furniture and Appliances, Inc., 804 F.2d at 89 ("Section 547(c)(5) prevents a secured creditor from improving its position at the expense of an unsecured creditor during the 90 days prior to filing the bankruptcy petition."); Matter of Lackow, 752 F.2d 1529, 1530 (11th Cir.1985) ("In order to fall within [the Sec. 547(c)(5) ] exception to preferential transfers a creditor['s] financial position [must not have] improve[d] within the ninety days prior to bankruptcy."). The bankruptcy court's adoption of a debtor perspective, by valuing inventory based upon a realization percentage to the debtor, contravenes the time-honored creditor focus of section 547(c)(5) and undermines the purposes of that provision. Thus, the courts below erred in valuing inventory from the perspective of Clark, rather than Associates. The appropriate measure of collateral value here is the net amount that could be received by Associates if, and when, it could have seized and sold the inventory.[4] See, e.g., In re Ebbler Furniture and Appliances, Inc., 804 F.2d at 92 ("The value of [a secured party's] interest depends on what [it] could do, outside of bankruptcy, to realize on its security. What it could do is seize and sell the inventory.") (Easterbrook, J., concurring).
 
 
 17
 Because we have determined that the courts below erroneously focused on the value of inventory in the hands of Clark, Associates' contention that the bankruptcy court erroneously deducted expenses of Clark unrelated to the cost of liquidation is largely rendered moot. However, we emphasize that, on remand, only costs related to a seizure and sale by Associates should be deducted in determining the value of inventory in the hands of Associates. Furthermore, in valuing inventory (or receivables) the court should consider the specific economic realities surrounding a transfer. In this connection we note that, even if the bankruptcy court's decision to value the inventory from the vantage point of the debtor had been correct, its choice of a value of 60% below cost is subject to serious question in the light of consistent record testimony to the effect that (i) the pipe market was stable during the ninety-day period, (ii) the fair market value of pipe was approximately 100% of cost, (iii) Clark actually liquidated inventory during the ninety-day period at 93-123% of cost and (v) pipe vendors were willing to give credit for returned pipe at or near 100% of cost. See In re Ebbler Furniture and Appliances, Inc., 804 F.2d 87 (7th Cir.1986), for a useful discussion of the valuation of collateral under the improvement in position test.
 
 
 18
 The parties stipulated at trial that, in the event we determined that the value of inventory from the perspective of Associates was relevant, the case should be remanded for the presentation of evidence on that point. We therefore remand for further proceedings regarding the value of inventory from the perspective of Associates.
 
 III
 
 19
 The second issue before us is whether the bankruptcy court was justified in equitably subordinating Associates' claims. This court has enunciated a three-pronged test to determine whether and to what extent a claim should be equitably subordinated: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. Missionary Baptist I, 712 F.2d at 212. Three general categories of conduct have been recognized as sufficient to satisfy the first prong of the three-part test: (1) fraud, illegality or breach of fiduciary duties; (2) undercapitalization; and (3) a claimant's use of the debtor as a mere instrumentality or alter ego. Id.
 
 
 20
 In essence, the bankruptcy court found that once Associates realized Clark's desperate financial condition, Associates asserted total control and used Clark as a mere instrumentality to liquidate Associates' unpaid loans. Moreover, it did so, the trustee argues, to the detriment of the rights of Clark's other creditors.
 
 
 21
 Associates contends that its control over Clark was far from total. Associates says that it did no more than determine the percentage of advances as expressly permitted in the loan agreement; it never made or dictated decisions as to which creditors were paid. Thus, argues Associates, it never had the "actual, participatory, total control of the debtor" required to make Clark its instrumentality under Krivo Industrial Supply Co. v. National Distillers & Chemical Corp., 483 F.2d 1098, 1105 (5th Cir.1973), modified factually, 490 F.2d 916 (5th Cir.1974) (elaborated in Valdes v. Leisure Resource Group, 810 F.2d 1345, 1354 (5th Cir.1987)). If it did not use Clark as an instrumentality or engage in any other type of inequitable conduct under Missionary Baptist I, argues Associates, then it cannot be equitably subordinated.
 
 
 22
 * We first consider whether Associates asserted such control over the activities of Clark that we should consider that it was using Clark as its mere instrumentality. In our prior opinion, we agreed with the district court and the bankruptcy court that, as a practical matter, Associates asserted total control over Clark's liquidation, and that it used its control in a manner detrimental to the unsecured creditors. Upon reconsideration, we have concluded that we cannot say that the sort of control Associates asserted over Clark's financial affairs rises to the level of unconscionable conduct necessary to justify the application of the doctrine of equitable subordination.[5] We have reached our revised conclusion primarily because we cannot escape the salient fact that, pursuant to its loan agreement with Clark, Associates had the right to reduce funding, just as it did, as Clark's sales slowed. We now conclude that there is no evidence that Associates exceeded its authority under the loan agreement, or that Associates acted inequitably in exercising its rights under that agreement.
 
 
 23
 We think it is important to note at the outset that the loan and security agreements between Associates and Clark, which are at issue here, were executed in 1980, at the inception of their relationship. There is no evidence that Clark was insolvent at the time the agreements were entered into. Clark was represented by counsel during the negotiations, and there is no evidence that the loan documents were negotiated at anything other than arm's length or that they are atypical of loan documents used in similar asset-based financings.
 
 
 24
 The loan agreement between Associates and Clark established a line of credit varying from $2.2 million to approximately $2.7 million over the life of the loan. The amount that Associates would lend was determined by a formula: 85% of the amount of eligible accounts receivables plus 60% of the cost of inventory. Under the agreement, Clark was required to deposit all collections from the accounts receivable in a bank account belonging to Associates. Associates would, in turn, re-advance the agreed-upon portion of those funds to Clark on a revolving basis. The agreement provided that Associates could reduce the percentage advance rates at any time in its discretion.
 
 
 25
 When Clark's business began to decline, along with that of the oil patch generally, Associates advised Clark that it would reduce the advance ratio for the inventory loan by 5% per month beginning in January 1982. After that time, the company stopped buying new inventory and, according to the Trustee's expert witness, Clark's monthly sales revenues amounted to less than one-fifth of the company's outstanding accounts payable. Clark prepared a budget at Associates' request that indicated the disbursements necessary to keep the company operating. The budget did not include payment to vendors for previously shipped goods. Associates' former loan officer, Fred Slice, testified as to what he had in mind:
 
 
 26
 If he [the comptroller of Clark] had had the availability [of funds to pay a vendor or other trade creditor] that particular day, I would have said, "Are you sure you've got that much availability, Jim," because he shouldn't have that much. The way I had structured it, he wouldn't have any money to pay his suppliers.
 
 
 27
 ....
 
 
 28
 But you know, the possibility that--this is all hypothetical. I had it structured so that there was no--there was barely enough money--there was enough money, if I did it right, enough money to keep the doors open. Clark could continue to operate, sell the inventory, turn it into receivables, collect the cash, transfer that cash to me, and reduce my loans.
 
 
 29
 And, if he had ever had availability for other things, that meant I had done something wrong, and I would have been surprised. To ask me what I would have done is purely hypothetical[;] I don't think it would happen. I think it's so unrealistic, I don't know.
 
 
 30
 Despite Associates' motive, which was, according to Slice, "to get in the best position I can prior to the bankruptcy, i.e., I want to get the absolute amount of dollars as low as I can by hook or crook," the evidence shows that the amount of its advances continued to be based on the applicable funding formulas. Slice testified that the lender did not appreciably alter its original credit procedures when Clark fell into financial difficulty.
 
 
 31
 In our original opinion, we failed to focus sufficiently on the loan agreement, which gave Associates the right to conduct its affairs with Clark in the manner in which it did. In addition, we think that in our previous opinion we were overly influenced by the negative and inculpatory tone of Slice's testimony. Given the agreement he was working under, his testimony was hardly more than fanfaronading about the power that the agreement afforded him over the financial affairs of Clark. Although his talk was crass (e.g., "I want to get the absolute dollars as low as I can, by hook or crook"), our careful examination of the record does not reveal any conduct on his part that was inconsistent with the loan agreement, irrespective of what his personal motive may have been.
 
 
 32
 Through its loan agreement, every lender effectively exercises "control" over its borrower to some degree. A lender in Associates' position will usually possess "control" in the sense that it can foreclose or drastically reduce the debtor's financing. The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender. The crucial distinction between what is inequitable and what a lender can reasonably and legitimately do to protect its interests is the distinction between the existence of "control" and the exercise of that "control" to direct the activities of the debtor. As the Supreme Court stated in Comstock v. Group of Institutional Investors, 335 U.S. 211, 229, 68 S.Ct. 1454, 1463, 92 L.Ed. 1911 (1948): "It is not mere existence of an opportunity to do wrong that brings the rule into play; it is the unconscionable use of the opportunity afforded by the domination to advantage itself at the injury of the subsidiary that deprives the wrongdoer of the fruits of his wrong."
 
 
 33
 In our prior opinion, we drew support from In re American Lumber Co., 5 B.R. 470 (D.Minn.1980), to reach our conclusion that Associates' claims should be equitably subordinated. Upon reconsideration, however, we find that the facts of that case are significantly more egregious than we have here. In that case, the court equitably subordinated the claims of a bank because the bank "controlled" the debtor through its right to a controlling interest in the debtor's stock. The bank forced the debtor to convey security interests in its remaining unencumbered assets to the bank after the borrower defaulted on an existing debt. Immediately thereafter, the bank foreclosed on the borrower's accounts receivable, terminated the borrower's employees, hired its own skeleton crew to conduct a liquidation, and selectively honored the debtor's payables to improve its own position. The bank began receiving and opening all incoming mail at the borrower's office, and it established a bank account into which all amounts received by the borrower were deposited and over which the bank had sole control. The bankruptcy court found that the bank exercised control over all aspects of the debtor's finances and operation including: payments of payables and wages, collection and use of accounts receivable and contract rights, purchase and use of supplies and materials, inventory sales, a lumber yard, the salaries of the principals, the employment of employees, and the receipt of payments for sales and accounts receivable.
 
 
 34
 Despite its decision to prohibit further advances to the debtor, its declaration that the debtor was in default of its loans, and its decisions to use all available funds of the company to offset the company's obligations to it, the bank in American Lumber made two specific representations to the American Lumbermen's Credit Association that the debtor was not in a bankruptcy situation and that current contracts would be fulfilled. Two days after this second reassurance, the bank gave notice of foreclosure of its security interests in the company's inventory and equipment. Approximately two weeks later the bank sold equipment and inventory of the debtor amounting to roughly $450,000, applying all of the proceeds to the debtor's indebtedness to the bank.
 
 
 35
 Associates exercised significantly less "control" over the activities of Clark than did the lender in American Lumber. Associates did not own any stock of Clark, much less a controlling block. Nor did Associates interfere with the operations of the borrower to an extent even roughly commensurate with the degree of interference exercised by the bank in American Lumber. Associates made no management decisions for Clark, such as deciding which creditors to prefer with the diminishing amount of funds available. At no time did Associates place any of its employees as either a director or officer of Clark. Associates never influenced the removal from office of any Clark personnel, nor did Associates ever request Clark to take any particular action at a shareholders meeting. Associates did not expressly dictate to Clark which bills to pay, nor did it direct Clark not to pay vendors or threaten a cut-off of advances if it did pay vendors. Clark handled its own daily operations. The same basic procedures with respect to the reporting of collateral, the calculation of availability of funds, and the procedures for the advancement of funds were followed throughout the relationship between Clark and Associates. Unlike the lender in American Lumber, Associates did not mislead creditors to continue supplying Clark. Cf. American Lumber, 5 B.R. at 474. Perhaps the most important fact that distinguishes this case from American Lumber is that Associates did not coerce Clark into executing the security agreements after Clark became insolvent. Instead, the loan and security agreements between Clark and Associates were entered into at arm's length prior to Clark's insolvency, and all of Associates' activities were conducted pursuant to those agreements.
 
 
 36
 Associates' control over Clark's finances, admittedly powerful and ultimately severe, was based solely on the exercise of powers found in the loan agreement. Associates' close watch over Clark's affairs does not, by itself, however, amount to such control as would justify equitable subordination. In re W.T. Grant, 699 F.2d 599, 610 (2d Cir.1983). "There is nothing inherently wrong with a creditor carefully monitoring his debtor's financial situation or with suggesting what course of action the debtor ought to follow." In re Teltronics Services, Inc., 29 B.R. 139, 172 (Bankr.E.D.N.Y.1983) (citations omitted). Although the terms of the agreement did give Associates potent leverage over Clark, that agreement did not give Associates total control over Clark's activities. At all material times Clark had the power to act autonomously and, if it chose, to disregard the advice of Associates; for example, Clark was free to shut its doors at any time it chose to do so and to file for bankruptcy.
 
 
 37
 Finally, on reconsideration, we are persuaded that the rationale of In re W.T. Grant Co., 699 F.2d 599 (2d Cir.1983) should control the case before us. In that case, the Second Circuit recognized that
 
 
 38
 a creditor is under no fiduciary obligation to its debtor or to other creditors of the debtor in the collection of its claim. [citations omitted] The permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; apart from these there is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make further loans needed by the debtor, to improve the status of his existing claims.
 
 
 39
 699 F.2d at 609-10. Associates was not a fiduciary of Clark, it did not exert improper control over Clark's financial affairs, and it did not act inequitably in exercising its rights under its loan agreement with Clark.
 
 B
 
 40
 Finally, we should note that in our earlier opinion, we found that, in exercising such control over Clark, Associates engaged in other inequitable conduct that justified equitable subordination. Our re-examination of the record indicates, however, that there is not really any evidence that Associates engaged in such conduct. Our earlier opinion assumed that Associates knew that Clark was selling pipe to which the suppliers had a first lien, but the issue of whether the vendors had a first lien on the pipe was not decided by our court until a significantly later time. In addition, although the trustee made much of the point on appeal, after our re-study of the record, we conclude that it does not support the finding that Associates encouraged Clark to remove decals from pipe in its inventory.
 
 
 41
 We also note that the record is devoid of any evidence that Associates misled other Clark creditors to their detriment. See, e.g., Matter of CTS Truss, Inc., 868 F.2d 146, 149 (5th Cir.1989) (lender did not represent to third parties that additional financing was in place or that debtor was solvent, when the opposite was true).
 
 
 42
 When the foregoing factors are considered, there is no basis for finding inequitable conduct upon which equitable subordination can be based. We therefore conclude that the district court erred in affirming the bankruptcy court's decision to subordinate Associates' claims.
 
 IV
 
 43
 Because we have held that equitable subordination is inapplicable in this case, we do not address the question whether avoiding the transfer and equitable subordination are duplicative or complementary remedies.
 
 
 44
 For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and the case is remanded for such further proceedings consistent with this opinion as may be necessary.
 
 
 45
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 *
 District Judge of the Western District of Louisiana, sitting by designation
 
 
 [1]
 Associates does not seek rehearing with regard to our decision that the bankruptcy court correctly determined the existence of a voidable preference and the amount of the preference. Our review of our prior opinion, however, convinces us that our holding with respect to valuation of the collateral is erroneous and should be corrected in order to avoid any precedential effect it may have on this point. We therefore, sua sponte, grant rehearing on that issue as well
 
 
 [2]
 Sections 547(b) and (c)(5) read:
 (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor--
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made--
 (A) on or within 90 days before the date of the filing of the petition; or
 (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer--
 (i) was an insider; and
 (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
 (5) that enables such creditor to receive more than such creditor would receive if--
 (A) the case were a case under chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 (c) The trustee may not avoid under this section a transfer--
 (5) of a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interest for such debt on the later of--
 (A)(i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the filing of the petition; or
 (ii) with respect to a transfer to which subsection (b)(4)(B) of this section applies, one year before the date of the filing of the petition; and
 (B) the date on which new value was first given under the security agreement creating such security interest;
 ....
 
 
 [3]
 Associates does not raise the issue of whether Clark's liquidation of inventory, its conversion to accounts receivable, and the subsequent payment of the proceeds to Associates worked to prejudice unsecured creditors where Associates had a security interest in both inventory and accounts receivable. The parties may have assumed that prejudice to the claims of the vendors satisfied this requirement. In any event, we do not reach that issue here. We only note, however, that improvement in position, standing alone, does not establish a preferential transfer--the transfer must be "to the prejudice of other creditors holding unsecured claims...." Coral Petroleum v. Banque Paribas-London, 797 F.2d 1351, 1355-56 (5th Cir.1986) ("For a preference to be voided under section 547, 'it is essential ... that the estate is thereby diminished.' "); Deel Rent-A-Car, Inc. v. Levine, 721 F.2d 750, 755-56 (11th Cir.1983) (citing Continental and Commercial Trust and Savings Bank v. Chicago Title and Trust, 229 U.S. 435, 443-44, 33 S.Ct. 829, 831-32, 57 L.Ed. 1268 (1913)) ("The fact that what was done worked to the benefit of the creditor, and in a sense gave him a preference, is not enough, unless the estate of the bankrupt was thereby diminished."); see also Duncan, Preferential Transfers, the Floating Lien, and Section 547(c)(5) of the Bankruptcy Reform Act, 36 Ark.L.Rev. 1, 29-33 (1982) (Under section 547(c)(5) "the trustee must show that the effect of the improvement was to decrease the amount of property otherwise available for liquidation and distribution to unsecured creditors")
 
 
 [4]
 On remand, the bankruptcy court may wish to consider, should any party pursue the issue, whether an unexercised vendor's privilege should be considered in valuing inventory from the perspective of Associates. We intimate no views, however, on the possible answers to that question
 
 
 [5]
 The question whether a creditor's conduct is so unconscionable as to require equitable subordination as a remedy is a conclusion of law, reviewable de novo. See, e.g. Wegner v. Grunewaldt, 821 F.2d 1317, 1322-23 (8th Cir.1987)