# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 15-20497

—————

United States Court of Appeals
Fifth Circuit

**FILED**

March 29, 2018

Lyle W. Cayce
Clerk

In the Matter of: HOUSTON REGIONAL SPORTS NETWORK, L.P.

          Debtor

------------------------------------------

HOUSTON SPORTSNET FINANCE, L.L.C.; COMCAST SPORTS
MANAGEMENT SERVICES, L.L.C.; NATIONAL DIGITAL TELEVISION
CENTER, L.L.C., doing business as Comcast Media Center;
NBCUNIVERSAL MEDIA, L.L.C.; SPORTSCHANNEL NEW ENGLAND,
L.L.C.; SPORTSCHANNEL PACIFIC ASSOCIATES; HOUSTON
SPORTSNET HOLDINGS, L.L.C.,

          Appellants,

v.

HOUSTON ASTROS, L.L.C.; ASTROS HRSN GP HOLDINGS, L.L.C.;
ASTROS HRSN LP HOLDINGS, L.L.C.; ROCKET BALL, LIMITED;
ROCKETS PARTNER, L.P.,

          Appellees.

—————

Appeal from the United States District Court
for the Southern District of Texas

—————

Before WIENER, PRADO, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

     Comcast[1] loaned Houston Regional Sports Network, L.P. (the Network)

---

[1] "Comcast" refers to Comcast Corporation and/or its subsidiaries and affiliates unless
otherwise specified.

No. 15-20497

$100 million, secured by a lien on substantially all of the Network's tangible and intangible assets.  Included in the assets was an Affiliation Agreement (the Agreement) pursuant to which a Comcast subsidiary agreed to pay the Network to carry the Network's content on its cable systems.  The Network involuntarily entered bankruptcy, and before a plan of reorganization was confirmed, Comcast elected to treat its entire claim as secured.  The bankruptcy court then conducted a valuation of the Network's assets, including the Agreement.  The valuation was as of the date of the bankruptcy petition, and, after deducting the Network's unpaid media fees from the Agreement's valuation, the court concluded that the Agreement had no value.  The district court affirmed.  Because the district court did not consider the value of Comcast's collateral in light of the reality of the plan of reorganization and accordingly deducted waived Network liabilities from the Agreement's value, we remand for further proceedings consistent with this opinion.

**I**

Houston Regional Sports Network, L.P. is a television network that was formed by the Houston Astros baseball team and Houston Rockets basketball team (the Teams)[2] to televise their respective games.  The Network entered into media-rights agreements with each of the Teams, pursuant to which the Network was granted exclusive rights to broadcast games in exchange for fees.  The Network also entered into an Affiliation Agreement with Comcast Cable Communications, LLC, pursuant to which Comcast would carry the Network on its cable systems through 2032, in exchange for a monthly fee based on the number of Comcast subscribers.  In 2010, a Comcast affiliate provided a $100 million loan to the Network, secured by a lien on substantially all of the

---

[2] The "Teams" refers to all appellees and their affiliates.

No. 15-20497

Network's tangible and intangible assets, including the Agreement but not the Teams' media rights.

In July and August 2013, the Network defaulted on consecutive payments to the Astros. The Astros sent a notice of default stating that if the Network did not cure the default by September 29, the Astros would have the right to terminate its agreement with the Network. On September 27, various Comcast entities filed an involuntary Chapter 11 petition against the Network. The Astros filed a motion to dismiss the petition, which the bankruptcy court denied. After the petition was filed but before the bankruptcy court ruled on its validity, Comcast and the Teams began negotiations for Comcast to purchase the Network out of bankruptcy, but no agreement was reached. Instead, the Teams entered into an agreement with AT&T and DirecTV. The agreement provided that AT&T and DirecTV would acquire all of the equity in the Network and enter into separate agreements to pay the Network for the right to broadcast the Network's content.

The sale agreement with AT&T and DirecTV was included in a plan of reorganization (the Plan), which the bankruptcy court confirmed in October 2014. Under the Plan, the Teams agreed to waive their rights to approximately $107 million in media-rights fees owed by the Network that had accrued during the bankruptcy.

Before the Plan was confirmed, Comcast made an election pursuant to 11 U.S.C. § 1111(b), which permits an undersecured creditor—a secured creditor whose collateral is worth less than its claim—to elect to have its claim treated as fully, rather than partially, secured.[3] This election guaranteed Comcast the right to receive a stream of payments. The present value of these

---

[3] *See* 11 U.S.C. § 1111(b).

No. 15-20497

payments is equal to the value of the collateral as determined by the court; the nominal value of the payments equals the amount of the claim.[4]

Under the amended Plan, the Network's tangible collateral—cash, accounts receivable, furniture, fixtures, and equipment—was to be sold, so Comcast's § 1111(b) election does not apply to that collateral.[5]  The parties stipulated to the bankruptcy court that the value of the tangible collateral was $26.2 million.  To value the intangible collateral, the bankruptcy court projected the Network's net income through 2032, discounted it to present value, and apportioned it among the Network's intangible assets in proportion to the revenue that each would generate.  Because the bankruptcy court was conducting the valuation as of the petition date, it apportioned income to agreements that did not exist as of the petition date based on the probability that such agreements would come to fruition.  Comcast's expert and the Teams' expert disagreed about whether and how the $107 million in waived media-rights fees should be included in the calculation.

The bankruptcy court concluded that the value of the Agreement would be $54.3 million on the date that the Plan would go into effect, but subtracted the waived media-rights fees from the Network's income in the period between the petition and the effective date, yielding large net losses for that period. Since the Agreement was the only significant intangible asset during that period, these costs lowered the Agreement's value as of the petition date to zero.  Because a creditor cannot make a § 1111(b) election as to collateral of

---

[4] 5 NORTON BANKR. L. & PRAC. 3d § 102:1 (2018).

[5] *See* 11 U.S.C. § 1111(b)(1)(B)(ii) (A creditor may not make a § 1111(b)(2) election if "the holder of a claim of such class has recourse against the debtor on account of such claim and such property . . . is to be sold under the plan.").

No. 15-20497

"inconsequential value,"[6] Comcast was unable to elect to have its claim treated as fully secured.

After the bankruptcy court confirmed the Plan, Comcast appealed the bankruptcy court's valuation of the Agreement to the district court. It also sought a stay of implementation of the Plan pending appeal. The district court denied the stay, but the Teams later agreed that they would be required to pay the debt if Comcast prevailed on appeal. The district court affirmed the valuation, holding that the petition date was the proper date from which to value the Agreement and that the expenses incurred by the Network during bankruptcy were appropriately offset against the Agreement's value. Comcast appeals.

## II

When we review a district court sitting as an appellate court, we apply "the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court."[7] This court "review[s] the bankruptcy court's findings of fact under the clearly erroneous standard, and the bankruptcy court's conclusions of law *de novo*."[8] The Bankruptcy Code does not require a particular method to value collateral, and "[v]aluation is a mixed question of law and fact, the factual premises being subject to review on a 'clearly erroneous' standard, and the legal conclusions being subject to *de novo* review."[9]

---

[6] *See id.* § 1111(b)(1)(B)(i) ("A class of claims may not elect application of paragraph (2) of this subsection if . . . the interest on account of such claims of the holders of such claims is of inconsequential value.").

[7] *In re Age Ref., Inc.*, 801 F.3d 530, 538 (5th Cir. 2015) (quoting *In re Crager*, 691 F.3d 671, 676 (5th Cir. 2012)).

[8] *Id.* (quoting *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 796 (5th Cir. 1997)).

[9] *In re Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 697-98 (5th Cir. 1990).

## III

Comcast challenges the valuation date utilized by the bankruptcy court. The bankruptcy court valued Comcast's claim as of the petition date because it assumed *In re Stembridge*[10] controlled, and in the alternative, because it had the flexibility to select a fair date. Comcast asserts that the statutory text and case law dictate that the appropriate valuation date is the effective date of the Plan, which would result in a higher valuation of the Agreement that is eligible for a § 1111(b) election. The Teams allege that *Stembridge* mandates valuation as of the petition date, and that the bankruptcy court correctly held that the Agreement was of inconsequential value and ineligible for § 1111(b). We conclude that a court is not required to use either the petition date or the effective date. Courts have the flexibility to select the valuation date so long as the bankruptcy court takes into account the purpose of the valuation and the proposed use or disposition of the collateral at issue.

The Bankruptcy Code itself does not dictate the appropriate valuation date for Chapter 11 bankruptcies. Under 11 U.S.C. § 506(a)(1), the value of a secured claim "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."[11] Section 506(a) is often used in conjunction with other parts of the Bankruptcy Code.[12] This includes the cram-down provision in § 1129(b), which requires valuation of collateral in the context of plan confirmation when the debtor retains possession of the collateral.[13] Under this cram-down provision,

---

[10] 394 F.3d 383 (5th Cir. 2004).

[11] 11 U.S.C. § 506(a)(1).

[12] *See, e.g.*, *id.* § 1325(a)(5) (stating that in a Chapter 13 context, in order for a plan of reorganization to be confirmed, a debtor must pay a secured creditor at least the value of the collateral unless the creditor consents to less favorable treatment).

[13] *Id.* § 1129(b).

a bankruptcy court may confirm a plan over a creditor's objection subject to certain conditions, so long as the plan "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."[14]

At issue in this case is § 1129(b)(2)(A)(i)(II), which provides that a bankruptcy plan is "fair and equitable" with respect to a class of claims—and thus confirmable over a creditor's objection—if under the plan:

> each holder of a claim of such class receives on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.[15]

This provision thus provides for the value of the collateral to be discounted to present value when considering whether the proposed plan provides adequate payment to the creditor. However, it is § 506 that instructs the court on how to make the initial valuation, before the collateral's present value is calculated under § 1129. Accordingly, whatever the valuation date, the language of § 1129 is not superfluous, as § 1129 presumes the collateral has been assigned value.[16] Section 1129 merely uses that value to set a floor for what sum the creditor must receive in deferred cash payments while the debtor retains possession of the collateral. It does not provide any guidance as to how the initial valuation should be made. That is left to § 506.

---

[14] *Id.* § 1129(b)(1).

[15] *Id.* § 1129(b)(2)(A)(i)(II).

[16] *See* H.R. REP. NO. 95-595, pt.4, at 413 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6369 ("The court may confirm a plan over the objection of [secured creditors] if the [creditors] . . . are to receive under the plan property of a value equal to the allowed amount of their secured claims, as determined under . . . 11 U.S.C. 506(a). The property [to be received under the plan] is to be valued as of the effective date of the plan, thus recognizing the time-value of money.").

No. 15-20497

A 2005 amendment to § 506 provides that in Chapter 7 and Chapter 13 personal bankruptcies involving claims of personal property, the valuation shall be as of the date of the petition and based on replacement value of the property.[17]  But the Code provides no similar guidance for Chapter 11 business reorganizations, nor for other types of property.  Rather, § 506(a)(1) directs the court to consider (1) "the purpose of the valuation;" (2) "the proposed disposition or use of [the] property;" and to do so (3) "in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."[18]  This provision allows the bankruptcy court to make valuations of collateral throughout the proceeding based on the purpose of each valuation.[19]

Precedent also does not mandate a specific valuation date in the Chapter 11 cram-down context.  Rather, case law requires that courts consider the purpose of the valuation and the proposed use or disposition of the collateral at issue.  In *Associates Commercial Corp. v. Rash*,[20] the Supreme Court stated that when considering possible valuations, the "debtor's 'use' of the property" was "[o]f prime significance," and the "actual use" of the property rather than a "foreclosure sale that will not take place" should guide the court's valuation.[21]  Though the court was considering whether foreclosure value or replacement value was appropriate in the Chapter 13 cram-down context,[22] the language

---

[17] 11 U.S.C. § 506(a)(2) ("If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.").

[18] *Id.* § 506(a)(1).

[19] *See* S. REP. NO. 95-989, pt. 1, at 68 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5854 ("To illustrate, a valuation early in the case in a proceeding under sections 361-363 would not be binding upon the debtor or creditor at the time of confirmation of the plan.").

[20] 520 U.S. 953 (1997).

[21] *Id.* at 963.

[22] *Id.* at 962-63.

8

No. 15-20497

provides guidance on the proper interpretation of § 506(a) as applied to plan-confirmation valuations when the debtor proposes to retain property.[23]

In addition, the Third and Eighth Circuits have held that the effective or confirmation date of the plan is the appropriate valuation date in a Chapter 11 cram-down valuation.  The Third Circuit adopted the confirmation date— albeit in a case where neither party challenged the timing of the valuation— based on the purpose of the valuation.[24]  As that court explained:

> [T]he value of the property should be determined as of the date to which the valuation relates.  Where, as here, the purpose of the valuation is to determine the treatment of a claim by a plan, the values determined at the § 506(a) hearing must be compatible with the values that will prevail on the confirmation date.[25]

The Eighth Circuit likewise determined that "[t]he allowed secured claim will equal the value of the collateral at the time the plan is confirmed" in a Chapter 11 cram-down,[26] and bankruptcy courts have generally adopted the same rule.[27]  These holdings are consistent with the leading bankruptcy treatise's discussion of the issue.[28]

---

[23] *See id.* at 962 (considering the proper valuation standard when a debtor "invoking cram down power, retains and uses the property").

[24] *In re Heritage Highgate, Inc.*, 679 F.3d 132, 143 (3d Cir. 2012) (affirming the bankruptcy court's conclusion "that the fair market value of the [collateral] as of the confirmation date controls whether the [creditor's] claims are secured or not").

[25] *Id.* at 143 n.9 (internal citations and quotation marks omitted).

[26] *In re Ahlers*, 794 F.2d 388, 400 n.14 (8th Cir. 1986), *rev'd on other grounds sub nom.*, *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988).

[27] *See, e.g.*, *In re Hales*, 493 B.R. 861, 866 (Bankr. D. Utah 2013) ("[T]he Court determines that the confirmation date, or a date near it, is the appropriate valuation date in [a § 1129 cram-down plan confirmation] case."); *In re Atlanta S. Bus. Park, Ltd.*, 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994) ("[W]hen valuation is for the purpose of plan confirmation, the value must be determined as of the date the plan is confirmed, and not at some other date."); *In re Landing Assocs., Ltd.*, 122 B.R. 288, 292 (Bankr. W.D. Tex. 1990) ("When the valuation is for purposes of plan confirmation, however, value must be determined as of *that* date."); *In re Seip*, 116 B.R. 709, 711 (Bankr. D. Neb. 1990) ("[F]or purposes of confirmation, collateral should be valued in close proximity to the date of confirmation.").

[28] 4 COLLIER ON BANKRUPTCY ¶ 506.03(7)(d)(i) (16th ed. 2015) ("If the debtor is to retain the collateral and proposes to treat the creditor's secured claim in accordance with [§1129's] first option, the relevant valuation determination under section 506(a) will often be

However, the Third Circuit recognized that a valuation conducted under § 506(a) may not always relate to the confirmation or effective date of the plan.[29] This is because § 506(a) valuations are used in a variety of contexts. For example, the First Circuit considered § 506(a) in the context of determining the amount of post-petition interest an oversecured creditor should receive.[30] The First Circuit determined that the flexible nature of § 506(a), as contrasted with the inflexible exception in § 506(a)(2), suggested the bankruptcy court was not bound to use the value of the collateral on either the petition date or the plan effective date.[31] Rather, when the value of collateral fluctuated over the course of the proceedings, the bankruptcy court could determine the value of the collateral as of the first point in time that the creditor became oversecured, and thus entitled to post-petition interest.[32] The First Circuit's opinion echoed this court's logic in *In re T-H New Orleans Ltd. Partnership*, where we held that, when considering a valuation for the purpose of determining an award of interest under § 506(b) "valuation of the collateral and the creditor's claim should be flexible and not limited to a single point in time, such as the petition date or confirmation date."[33] This court thus found no error in the bankruptcy court's use of the date at which it determined the claim "probably" became oversecured.[34]

---

straightforward: the court must simply value the collateral as of the effective date of the debtor's plan in order to determine the allowed amount of the creditor's secured claim.").

[29] *Heritage Highgate,* 679 F.3d at 142 n.7 (recognizing that "the appropriate time as of which to value collateral may differ depending on the facts presented").

[30] *In re SW Boston Hotel Venture, LLC*, 748 F.3d 393, 405-06 (1st Cir. 2014).

[31] *Id.* at 405-07 ("The fact that Congress mandated particular measuring dates in the exception [in § 506(a)(2)] without mandating a particular measuring date in the general rule suggests that it intended flexibility under § 506(a)(1).").

[32] *Id.* at 407-08.

[33] 116 F.3d 790, 798 (5th Cir. 1997).

[34] *Id.* at 798-99 & n.9.

No. 15-20497

That § 506(a) valuations may be made at different times under different circumstances does not lessen the force of the Third and Eighth Circuit holdings that the appropriate valuation date is the date of plan confirmation in the Chapter 11 cram-down context. When a court values collateral to confirm a cram-down plan under § 1129(b)(2)(A)(i), the proposed use or disposition of the property under the plan of reorganization is critical, precisely because the debtor is choosing to retain the collateral, rather than sell it or return it to the creditor.[35] Yet the bankruptcy court can determine the appropriate date of valuation on a case-by-case basis and we need not adopt a bright-line rule.

Contrary to the Teams' assertions and the bankruptcy court's holding, this court's decision in *Stembridge* does not compel a fixed valuation as of the date of the petition for Chapter 11 cram-downs. Though some language in the opinion could be broadly read to include all cram-downs,[36] the holding that "the value of the collateral should be determined as of the filing of the petition" was limited to § 1325 plan confirmations.[37]

We decline to extend the per se valuation date of *Stembridge* to Chapter 11 cram-downs. Congress implicitly rejected such an extension when it codified the *Stembridge* holding in § 506(a)(2). That codification specifically provided that personal property in Chapter 7 and 13 bankruptcies must be valued as of the petition date but made no such provision for Chapter 11

---

[35] 11 U.S.C. § 1129(b)(2)(A); *see Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 964 (1997) (reasoning that in the cram-down context §506(a) "calls for the value of the property possesses in light of the 'disposition or use' in fact 'proposed,' not the various dispositions or uses that might have been proposed").

[36] *See In re Stembridge*, 394 F.3d 383, 385 (5th Cir. 2004) (framing the issue as "when should a bankruptcy court determine the value of a secured claim for the confirmation of a plan under the code's cram-down provision").

[37] *Id.* at 388.

11

bankruptcies.[38]  This omission suggests Congress did not intend to limit courts to the petition date in all Chapter 11 bankruptcies.[39]  There is good reason for not mandating a petition-date valuation for Chapter 11 cram-downs. Involuntary bankruptcies like this one are not permitted in the Chapter 13 context.[40]  Section 506(a) requires that the valuation of collateral take into account the proposed use or disposition of that collateral.[41]  While the petition date may not be an issue when the parties have an immediate plan of reorganization, such rapid action should not be assumed in involuntary cases. In an involuntary bankruptcy, there may not be any proposed use or disposition of the collateral at the filing of the petition, because the Chapter 11 debtor did not choose to file bankruptcy.  As the court noted in *Stembridge*, "in many, if not most, cases involving a cram-down, the plan is confirmed along with, or shortly thereafter, the filing of the original petition."[42]  However, involuntary Chapter 11 bankruptcies present the converse.  Rarely, if ever, would the court expect a plan confirmation to coincide with the filing of an involuntary bankruptcy.  The petition-date mandate in *Stembridge* does not apply to involuntary Chapter 11 bankruptcies.

*Stembridge* did not require the bankruptcy court to value Comcast's collateral as of the petition date.  Neither the Code nor precedent requires this court to adopt any per se valuation date in the Chapter 11 cram-down context. We continue to follow the flexible approach to valuation timing that allows the bankruptcy court to take into account the development of the proceedings, as

---

[38] 11 U.S.C. § 506(a)(2).

[39] *See In re SW Boston Hotel Venture, LLC*, 748 F.3d 393, 406 (1st Cir. 2014) (explaining that § 506(a)(2) created an exception to the general rule set forth in § 506(a), and that the amendment "suggests that [Congress] intended flexibility under § 506(a)(1)").

[40] 11 U.S.C. § 303.

[41] *Id.* § 506(a)(1).

[42] *Stembridge*, 394 F.3d at 386 n.6.

the value of the collateral may vary dramatically based on its proposed use under any given plan.[43]   The bankruptcy court stated that under a flexible approach it would still use the petition date to value the Agreement, so its erroneous reliance on *Stembridge* is harmless.   Nevertheless, we remand for a re-valuation of the Agreement because the bankruptcy court failed to value the collateral in light of its proposed use when it deducted all unpaid media fees from the value of the Agreement.

## IV

The bankruptcy court erred in deducting the Teams' unpaid, waived media fees from the value of Comcast's collateral.   In order to value the Agreement as of the petition date, the bankruptcy court first valued the Network's assets at the effective date of the Plan and allocated a proportional amount of that value to the Comcast Agreement.   It then discounted that value back to the date of the petition using a discount rate provided by both experts, yielding a value for the Agreement of $54,274,470 as of the effective date of the Plan.   The bankruptcy court then took the total amount of unpaid media fees that had accrued between the petition date and the effective date, discounted that to the value as of the petition date using the same discount rate, and subtracted it from the value of the Agreement, resulting in a value of zero that is "inconsequential" under § 1111(b) and thus ineligible to be treated as an entirely secured claim.[44]

---

[43] *See, e.g., In re Williams*, 850 F.2d 250, 252-53 (5th Cir. 1988) (affirming denial of plan confirmation when the sale of horses was proposed to satisfy unsecured claims under Chapter 11 cram-down provision based on bankruptcy court's finding that, given the depressed market and boarding costs, the value of the horses under the plan was not equal to the amount allowed of the creditor's claims, despite an earlier order that set a higher value).

[44] 11 U.S.C. § 1111(b)(1)(B)(i).

The first part of the bankruptcy court's valuation took into account the proposed use of the Agreement by the reorganized Network, then discounted that value back to the date of the petition. As discussed, this was permissible under the Code and this circuit's precedent. However, the subtraction of the media fees incurred during the bankruptcy is improper because it does not value the collateral in light of its proposed use by the debtor and is an impermissible surcharge.

Subtracting the Teams' unpaid media fees from the Agreement's value was error because it does not consider the collateral's value in light of the actual proposed post-reorganization use, as required by § 506(a) and the Supreme Court's decision in *Rash*. Section 506(a) commands that the collateral be valued in light of its proposed use by the reorganized debtor.[45] Under the Plan, the Network will now be able to use the Agreement to generate revenue free and clear of the previously outstanding media-rights fees, as the Teams have agreed to waive them. Therefore, the value of the Agreement in the reorganized debtor's hands is unaffected by these waived fees. Subtracting those costs from the value of Comcast's collateral would value the Agreement in light of a hypothetical disposition of the property—i.e. liquidation—that will not occur.[46]

The Supreme Court's decision in *Rash* confirms that bankruptcy court valuations must be based on actual use.[47] Valuing Comcast's collateral based on fees that will never be paid is inappropriate. The costs will not be borne by the Network and therefore are not deductible from the collateral the Network

---

[45] *Id.* § 506(a)(1) ("Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property.").

[46] *See Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 963-964 (1997) (confining the § 506(a) inquiry to the actual proposed use or disposition of the property).

[47] *Id.* at 963 ("[A]ctual use, rather than a foreclosure sale that will not take place, is the proper guide.").

retains under the Plan.  Though the Teams are correct that retained assets must be valued for both their positive and negative values, the Plan eliminates the media-rights fees that the bankruptcy court deducted from the Agreement's value.  Thus, the waived fees are not appropriately considered in valuing the Agreement in light of its proposed use by the reorganized debtor. The bankruptcy court erred in adjusting the valuation of the collateral to reflect costs that will not be incurred under the Plan as actually proposed.

Additionally, subtracting the media-rights fees—an administrative expense—from the value of the collateral is an impermissible surcharge.  "The general rule in bankruptcy is that administrative expenses cannot be satisfied out of collateral property, 'but must be borne out of the unencumbered assets of the estate.'"[48]  Carved out in 11 U.S.C. § 506(c) is a narrow exception that allows for recovery of expenditures out of a creditor's collateral if the expenses are (1) necessary; (2) reasonable; and (3) benefit the creditor.[49]

However, even if the fees were necessary and reasonable, the Network never paid the Teams, and never will under the Plan.  While this Court has approved orders requiring payment of expenses incurred,[50] it has never authorized charging a secured creditor for an expense that was never and would never be paid under the reorganization plan.  The Fourth Circuit has held that "no § 506(c) 'recovery should be permitted if the expenditure was . . . the independent duty of the debtor, debtor in possession or trustee to maintain its property (even if the value of the collateral increased as an

---

[48] *In re Domistyle, Inc.*, 811 F.3d 691, 695 (5th Cir. 2015) (quoting 4 COLLIER ON BANKRUPTCY ¶ 506.05 (16th ed. 2015)).

[49] 11 U.S.C. § 506(c) ("The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."); *Domistyle*, 811 F.3d at 695 (quoting *In re Delta Towers, Ltd.*, 924 F.2d 74, 76 (5th Cir. 1991)).

[50] *See, e.g., In re Senior-G & A Operating Co.*, 957 F.2d 1290, 1299-1300 (5th Cir. 1992).

incidental result thereof).'"[51]  In this case, the fees were incurred by the debtor Network, which was obligated to pay the Teams the media-rights fees under that agreement.

Furthermore, to benefit the creditor, the expenses must be "directly related to preserving or enhancing" that encumbered property.[52]  While costs incurred to preserve the value of the estate are not categorically excluded, this Circuit requires a determination of "how much benefit the secured creditor actually received."[53]  In this case, that benefit would be zero, because the court determined that, after subtracting the media-rights fees, the value of the Agreement was zero—the same value it would have had in liquidation. Accordingly, the media-fees waiver did not benefit Comcast given the bankruptcy court's valuation.

The unpaid media-rights fees should not have been incorporated into the valuation of Comcast's collateral.  The fees will never be paid under the Plan, and thus cannot be attributed to the value of the Agreement in light of its "proposed use."  Moreover, the fees incurred by the Network to preserve its media rights and facilitate reorganization did not inure to Comcast's benefit. The Agreement must be valued in light of the Plan, without recourse to hypothetical situations which are neither proposed nor likely in this Chapter 11 cram-down.

\* \* \*

For the foregoing reasons, we REMAND this case to the bankruptcy court for a re-valuation of the collateral in light of the Plan.

---

[51] *In re K & L Lakeland, Inc.*, 128 F.3d 203, 210 (4th Cir. 1997) (quoting 3 COLLIER ON BANKRUPTCY ¶ 506.06 (15th ed. 1996) (requiring an actual expenditure of money for a 506(c) surcharge)).

[52] *Domistyle*, 811 F.3d at 698 (emphasis omitted).

[53] *Id.* at 700.