# United States Court of Appeals
## For the First Circuit

Nos. 12-9008, 12-9009

SW BOSTON HOTEL VENTURE, LLC; AUTO SALES & SERVICE, INC.;
GENERAL TRADING COMPANY; FRANK SAWYER CORPORATION;
100 STUART STREET, LLC; 30-32 OLIVER STREET CORPORATION;
GENERAL LAND CORPORATION; 131 ARLINGTON STREET TRUST,

Debtors.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,

Appellee,

v.

SW BOSTON HOTEL VENTURE, LLC; AUTO SALES & SERVICE, INC.;
GENERAL TRADING COMPANY; FRANK SAWYER CORPORATION;
100 STUART STREET, LLC; 30-32 OLIVER STREET CORPORATION;
GENERAL LAND CORPORATION; 131 ARLINGTON STREET TRUST,

Appellants.

Nos. 12-9011, 12-9012

SW BOSTON HOTEL VENTURE, LLC; AUTO SALES & SERVICE, INC.;
GENERAL TRADING COMPANY; FRANK SAWYER CORPORATION;
100 STUART STREET, LLC; 30-32 OLIVER STREET CORPORATION;
GENERAL LAND CORPORATION; 131 ARLINGTON STREET TRUST,

Debtors.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,

Appellee,

v.

CITY OF BOSTON,

Appellant.

APPEALS FROM THE BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

Before

Lynch, <u>Chief Judge</u>,
Stahl and Howard, <u>Circuit Judges</u>.

Harold B. Murphy, with whom <u>Charles R. Bennett, Jr.</u>, <u>John C. Elstad</u>, <u>Christopher M. Condon</u>, and <u>Murphy & King, P.C.</u>, were on brief, for appellants SW Boston Hotel Venture, LLC; Auto Sales & Service, Inc.; General Trading Company; Frank Sawyer Corporation; 100 Stuart Street, LLC; 30-32 Oliver Street Corporation; General Land Corporation; and 131 Arlington Street Trust.
<u>E. Kate Buyuk</u>, with whom <u>Joseph F. Ryan</u> and <u>Lyne, Woodworth & Evarts LLP</u> were on brief, for appellant City of Boston.
<u>Emanuel C. Grillo</u>, with whom <u>William M. Jay</u> and <u>Goodwin Procter LLP</u> were on brief, for appellee.

April 11, 2014

**STAHL, Circuit Judge**.   This appeal presents multiple issues arising from a heavily contested Chapter 11 bankruptcy proceeding.   Stated simply, a secured creditor appealed to the Bankruptcy Appellate Panel for the First Circuit ("the BAP") from the bankruptcy court's orders determining its entitlement to post-petition interest (and thus the total amount of its claim) and confirming the debtors' Chapter 11 plan.   The BAP reversed in part, significantly increasing the secured creditor's entitlement to post-petition interest, and vacated and remanded the confirmation order.   The debtors and the City of Boston ("City"), as a junior creditor, appealed to this court.   After careful consideration, we conclude that the BAP erred in reversing the bankruptcy court's post-petition interest determination.   And, because the BAP's confirmation order was based solely on its erroneous interest determination, we vacate that order as well.

## I.   Facts & Background

### A.        Financing and Construction of the W

In 2007, Debtor-Appellant SW Boston Hotel Venture, LLC, ("SW Boston") sought financing to develop a mixed-used property that would become the W Hotel and Residences ("the W") in Boston's theater district.   In January of 2008, after a previous lender withdrew its financing commitment, the Prudential Insurance Company of America ("Prudential") agreed to provide up to $192.2 million in financing ("the Prudential Loan") pursuant to a construction loan

-3-

agreement ("the CLA"). Prudential took a mortgage and first priority security interest in SW Boston's real and personal property and any proceeds thereof. It also required additional collateral and credit support in the form of certain real estate and other property owned by the remaining Debtors-Appellants ("Affiliated Debtors"), as well as a $17.3 million letter of credit. Sovereign Bank issued the letter of credit based on the credit provided by two non-debtor affiliates of SW Boston.

The W project consists of a 235-room hotel, 123 luxury condominium units, an underground parking garage, a restaurant, a spa and related retail space, and a bar. The hotel was to operate under the W Hotels brand of Starwood Hotels and Resorts Worldwide, Inc. ("Starwood"), with Starwood managing the operations.

The W opened on schedule in October of 2009, but, due in large part to the ongoing recession, obtained substantially fewer commitments to purchase condominiums than the CLA required. In addition, the restaurant, spa, and bar -- all required to operate under the W Hotel flag -- had not been completed, and the Debtors lacked sufficient funding to complete them. In December 2009, after Prudential declined to provide additional funds, SW Boston and the City entered into a loan agreement ("the City Loan"), with the City agreeing to provide $10.5 million in additional funding.[1]

---

[1] The City stresses that, to make this loan, it borrowed $10.5 million from the U.S. Department of Housing and Urban Development, giving in return a note secured by a pledge of present and future

The City Loan was secured by a junior lien on most of the collateral that secured the Prudential Loan and a first lien on $4 million in cash provided by an Affiliated Debtor. The CLA required the Debtors to obtain Prudential's consent before entering into any junior loans. In return for its consent, Prudential required the City to execute an Intercreditor Agreement that, among other things, subordinated the City's right to payment to Prudential and purported to assign to Prudential the City's right to vote on any bankruptcy plan.

## B.        Bankruptcy Court Proceedings

On April 28, 2010, after SW Boston failed to make a mandatory quarterly payment to Prudential and loan-restructuring negotiations failed, SW Boston and four of the Affiliated Debtors filed voluntary Chapter 11 bankruptcy petitions. The remaining three Affiliated Debtors commenced Chapter 11 cases on June 4. The bankruptcy court administered all of the Chapter 11 cases jointly. Prudential filed a proof of claim asserting secured claims of not less than $180,803,186, plus fees, costs, and pre- and post-petition interest. Shortly after the petition date, Prudential

---

Community Development Block Grant revenues, funding the City relies on for its affordable housing and economic development programs. The City further notes that, had it not stepped in, "[t]he Debtors and Prudential both were at risk of losing significant portions of their investments, and the City of Boston would have been left with an unfinished building that would have been a blight and an economic detriment to an already vulnerable section of the city."

drew down the letter of credit, reducing its pre-petition claim to $165,592,659.

The filing of the bankruptcy petitions resulted in imposition of an automatic stay as to all creditors' efforts to enforce their liens. See 11 U.S.C. § 362(a). However, § 362(d) requires the court to grant relief from the stay unless certain creditor safeguards are met. See id. § 362(d)(1).[2] In August of 2010, Prudential filed a motion for relief from the stay as to SW Boston only ("lift-stay motion"), arguing that it was undersecured because the amount of its claim against SW Boston exceeded the value of SW Boston's assets and that the Debtors lacked the means to provide alternative forms of adequate protection. It sought permission to exercise its contractual rights and remedies to, among other things, commence foreclosure proceedings. In its January 28, 2011, ruling, the bankruptcy court found that SW Boston's outstanding debt to Prudential, after deductions for payments made from ongoing condominium sales and exclusive of any post-petition interest or expenses, was approximately $154 million. Prudential's expert valued the remaining condominiums at $86

---

[2] The bankruptcy court is directed to grant relief from the stay "for cause, including the lack of adequate protection of an interest in property of such party in interest;" or, with respect to an act against particular property, if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization . . . ." 11 U.S.C. § 362(d)(1), (2). Prudential moved for relief under both subsections.

million and the W hotel at $55 million, while SW Boston's expert valued the remaining condominiums at $90.6 million and the hotel at $65.6 million. After a three-day evidentiary hearing, the bankruptcy court concluded that the value of the condominiums was $88 million and the value of the hotel was $65.6 million, making the total value of SW Boston's collateral $153.6 million. Thus, Prudential was undersecured as to SW Boston alone. However, the bankruptcy court noted that, with respect to the entire collateral package of all of the Debtors, Prudential had an equity cushion in excess of $19 million. Taking that finding in conjunction with the facts that SW Boston was reducing the amount of the outstanding debt through payments from condominium sales and that the value of its secured claim was not declining, the bankruptcy court concluded that Prudential was adequately protected under § 362(d)(1). With respect to § 362(d)(2), the bankruptcy court found that SW Boston lacked equity in the W project, but that the property was necessary to a successful reorganization, which the court ruled was reasonably likely. The bankruptcy court therefore denied Prudential's lift-stay motion on January 28, 2011.

On March 28, 2011, SW Boston filed a motion for court approval of a purchase and sale agreement ("the P&S") for the sale of the hotel and garage to an unrelated third party for $89.5 million. The bankruptcy court granted the motion on May 24. But, before the sale could close, SW Boston was required to resolve

-7-

several outstanding issues on which the P&S was contingent.  For example, the P&S was conditioned on the assignment of certain construction warranties from the W's construction manager, Bovis Lend-Lease LMB, Inc. ("Bovis"), to the purchaser.  Although the Bovis-SW Boston contract required assignment of the warranties to SW Boston upon completion of the project, Bovis claimed to be excused from this obligation due to various disputes with SW Boston.  The P&S was also conditioned on the assignment to the purchaser of several Starwood-SW Boston contracts.  However, Starwood alleged that various incurable non-monetary defaults -- including failure to timely open the spa and bar -- precluded assumption and assignment of the contracts.  After SW Boston managed to resolve these contingencies, the sale closed on June 8, 2011, and the net proceeds of $88,322,017 were paid over to Prudential.

On March 31, 2011, three days after filing the hotel sale motion, the Debtors filed their reorganization plan.  The plan need not be described in great detail, but, in broad strokes, it called for Prudential to be paid in full by March of 2014 if the hotel sale closed, or after a more extended period if it did not.  The plan contemplated that Prudential would receive post-effective-date interest of 4.25% per annum, but it made no provision for post-petition, pre-effective-date interest.  Prudential objected to confirmation of the plan on multiple grounds.

Throughout the pendency of the bankruptcy case, SW Boston continued construction.  After SW Boston resolved various issues with contractors who had suspended their work because of the bankruptcy filings, the spa was completed and opened on August 18, 2010.  That September, after two work interruptions caused by a change in the building code and the state's appeal of a variance granted to SW Boston, SW Boston received all necessary approvals to recommence construction of the bar.  Multiple open construction items on the W were completed.  SW Boston continued to sell condominiums, paying over the proceeds (less certain deductions) to Prudential.

On April 15, 2011, Prudential moved for a determination that it was oversecured and therefore entitled to post-petition interest under 11 U.S.C. § 506(b).[3]  In general terms, a claim is oversecured if the value of the creditor's interest in its collateral exceeds the amount of its claim.  Under § 506(b), an oversecured creditor is entitled to post-petition interest, as well as reasonable fees, costs, or charges provided for in the parties' contracts or by state law, up to the extent of its oversecurity.  Prudential argued that it should receive post-petition interest at

---

[3] Specifically, Prudential sought to apply any condominium proceeds it received from the Debtors first to outstanding post-petition interest and second to the outstanding principle balance of the Prudential Loan.

the contractual default rate of 14.5% per annum,[4] 5% higher than the contractual base rate, accruing from the petition date. The Debtors argued that Prudential only became oversecured upon the closing of the hotel sale, and therefore could only receive post-petition interest from that point forward. They also claimed that the default rate was unenforceable and inequitable, and requested that, to the extent Prudential was entitled to any post-petition interest, it should accrue at the base rate of 9.5% per annum.

The bankruptcy court held a three-day combined trial addressing Prudential's § 506(b) motion and the Debtors' proposed plan. On October 4, 2011, it issued an order granting Prudential post-petition interest at 14.5% per annum, commencing on the hotel sale date. The court ruled that the hotel sale price, rather than its earlier valuation at the lift-stay hearing, was the best indicator of the hotel's value. However, it also noted that, in light of the ongoing improvements and the resolution of various contingencies, the sale price did not reflect its value on any earlier date. Therefore, it found that Prudential only became oversecured once the hotel sale closed. After receiving the parties' interest calculations (which differed only as to whether the interest should be compounding), the bankruptcy court entered an order fixing Prudential's claims, inclusive of non-compounding

_____

[4] As discussed in greater detail below, after the bankruptcy court issued its § 506(b) order, Prudential also claimed that it was entitled to monthly compounding of its interest.

-10-

post-petition interest.  Prudential appealed and the Debtors cross-appealed the § 506(b) decision and the resultant claim order to the BAP.

On November 14 and 16, respectively, the bankruptcy court issued an opinion finding that the plan (with some modifications) met all confirmation requirements and an order confirming the modified plan over Prudential's objections.  On November 17, Prudential filed a notice of appeal of the confirmation decision to the BAP, along with a motion to stay the confirmation order pending appeal.  The bankruptcy court denied the stay motion on November 21, and, on November 30, so did the BAP when Prudential sought the same relief there.  The plan became effective on December 1.

C.        **Bankruptcy Appellate Panel Proceedings**

While the parties were briefing the appeals, the Debtors moved to dismiss Prudential's appeals as equitably moot.  The BAP found that, although the plan had been substantially consummated, the appeals were not equitably moot because Prudential could still be afforded relief without harming innocent third parties or unraveling the reorganization (especially because Prudential represented its willingness to accept alternative forms of relief that would not require such unraveling).

As to the § 506(b) appeal, the BAP: (1) held that Prudential was entitled to post-petition interest from the petition date, reversing the bankruptcy court's finding that Prudential had

-11-

only become oversecured on the hotel sale date; (2) affirmed the bankruptcy court's determination that the contractual default rate of interest (14.5%) applied; and (3) reversed the bankruptcy court's ruling that the interest was not compounding. As to the confirmation order appeal, without addressing the confirmability of the plan, the BAP vacated and remanded the confirmation order so that the plan could be amended to accommodate Prudential's now-increased claim. The Debtors and the City[5] each appealed both of the BAP's decisions to this court. Prudential moved to dismiss the confirmation order appeals for lack of jurisdiction, arguing that they were not final appealable orders. Those motions were referred to this panel for consideration along with the merits.

Throughout these proceedings, the Debtors have continued to sell W condominiums and have since paid Prudential the full amount due under the originally confirmed plan. The City, in contrast, has not received all the payments owed to it under the plan, which became effective on December 1, 2011. The Debtors, we were informed at oral argument, have also stopped making installment payments owed to other creditors under that plan.

---

[5] The City, as a junior lienholder, argues that its ability to recover its affordable housing and economic development money may be severely compromised if the BAP's order stands.

## II. Analysis

According no special deference to the BAP, we focus instead on the bankruptcy court's decisions, reviewing conclusions of law de novo and findings of fact for clear error. Stornawaye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 32 (1st Cir. 2009). The bankruptcy court's interpretation of the relevant statutes presents a question of law, while its application of those statutes to the facts of this case presents a mixed question of law and fact that we review for clear error unless its analysis was "infected by legal error." Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries, Inc.), 50 F.3d 72, 73 (1st Cir. 1995) (internal quotation marks omitted). Absent legal error, we will not reverse a factual finding under this "formidable standard," Sharfarz v. Goquen (In re Goquen), 691 F.3d 62, 69 (1st Cir. 2012), unless, "on the whole of the record, we form a strong, unyielding belief that a mistake has been made," Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990). "If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, we may not reverse." Goat Island S. Condo. Ass'n v. IDC Clambakes, Inc. (In re IDC Clambakes, Inc.), 727 F.3d 58, 64 (1st Cir. 2013) (alteration and internal quotation marks omitted).

**A.**          **Equitable Mootness**

The Debtors first appeal from the BAP's denial of their motions to dismiss Prudential's appeals as equitably moot. The doctrine of equitable mootness allows an appellate court to dismiss a bankruptcy appeal if "an unwarranted or repeated failure to request a stay enabled developments to evolve in reliance on the bankruptcy court order to the degree that their remediation has become impracticable or impossible," Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.), 136 F.3d 45, 48 (1st Cir. 1998), or if "the challenged bankruptcy court order has been implemented to the degree that meaningful appellate relief is no longer practicable even though the appellant may have sought a stay with all due diligence," id.

As a threshold issue,[6] the parties dispute the appropriate standard of review, the subject of a circuit split that this circuit has not yet addressed. Compare Liquidity Solutions, Inc. v. Winn-Dixie Stores, Inc. (In re Winn-Dixie Store, Inc.), 286

---

[6] There is, in fact, a prior threshold issue. Prudential argues that this court lacks jurisdiction because the Debtors did not identify in their notices of appeal the BAP's orders denying the motions to dismiss. We disagree. See Martínez-Serrano v. Quality Health Servs. of P.R., Inc., 568 F.3d 278, 282–83 (1st Cir. 2009) (rejecting argument that court lacked jurisdiction to consider exclusion of expert witness where only final judgment was listed in notice, because "a notice of appeal is deemed to encompass not only the final judgment but also all interlocutory orders that merge into it"). Moreover, the Debtors listed the equitable mootness issue in their statement of issues on appeal, and there is no assertion that Prudential was caught by surprise due to technical defects, if any, in the notices of appeal.

-14-

F. App'x 619, 622 & n.2 (11th Cir. 2008) (per curiam) (adopting de novo standard), Curreys of Neb., Inc. v. United Producers, Inc. (In re United Producers, Inc.), 526 F.3d 942, 946–47 (6th Cir. 2008) (same), and United States v. Gen. Wireless, Inc. (In re GWI PCS 1 Inc.), 230 F.3d 788, 799–800 (5th Cir. 2000) (same), with $R^2$ Invs., Inc. v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.), 691 F.3d 476, 483 (2d Cir. 2012) (adopting abuse-of-discretion standard), Search Mkt. Direct, Inc. v. Jubber (In re Paige), 584 F.3d 1327, 1334–35 (10th Cir. 2009) (same), In re Continental Airlines, 91 F.3d 553, 560 (3d Cir. 1996) (en banc) (same), and In re AOV Indus., Inc., 792 F.2d 1140, 1148 (D.C. Cir. 1986) (same).

The Debtors argue that our review should be de novo "[s]ince the [c]ourt applies plenary review to virtually all other rulings of the BAP." Prudential, noting that a dismissal for equitable mootness is an exercise of the "court's discretion in matters of remedy and judicial administration not to determine a case on its merits," Rochman v. Ne. Utils. Serv. Grp. (In re Pub. Serv. Co. of N.H.), 963 F.2d 469, 471 (1st Cir. 1992) (internal quotation marks omitted), argues that review should be for abuse of that discretion. We need not resolve the issue because we cannot say that the BAP's refusal to dismiss the appeals was inappropriate under either standard.

In a careful and detailed analysis that we need not reproduce here, the BAP considered the relevant factors and

-15-

concluded that, if Prudential prevailed on appeal, the bankruptcy court could fashion some form of practicable relief, even if only partial or alternative. We perceive no reason to dislodge this determination. We therefore turn to the substance of the bankruptcy court's orders.

**B.        § 506(b) Order**

As a general matter, unmatured interest is not allowed after the filing of a bankruptcy petition. 11 U.S.C. § 502(b)(2). However, Congress has created an exception to this rule in the case of "oversecured" creditors. See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 372–73 (1988); Ford Motor Credit Co. v. Dobbins, 35 F.3d 860, 869 (4th Cir. 1994). Two provisions of § 506 of the Bankruptcy Code govern the award of post-petition interest to an oversecured creditor. First, § 506(a) sets the amount of a creditor's allowed secured claim:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property,[7] . . . and is an unsecured claim to the extent

---

[7] A creditor's "interest in property" is its "security interest without taking account of [its] right to immediate possession of the collateral on default," Timbers, 484 U.S. at 372, or, in other words, the value of the collateral alone, not including other rights that the word "interest" may invoke, id. at 371–72. The phrase "the value of such creditor's interest in the estate's interest in such property" recognizes that a debtor may not own the entire interest in the collateral and that other creditors may hold senior liens on that same collateral. "A debtor may own only a part interest in the property pledged as collateral, in which case the court will be required to ascertain the 'estate's

-16-

that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a)(1).[8] Thus, a claim may be bifurcated into secured and unsecured portions depending on the value of the collateral. Next, § 506(b) defines an oversecured creditor's entitlement to post-petition interest:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

interest' in the collateral. Or, a creditor may hold a junior or subordinate lien, which would require the court to ascertain the creditor's interest in the collateral." Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 961 (1997). Here, Prudential is the senior creditor, so its interest in the collateral is undiminished. In addition, although the parties dispute whether the various Debtors' collateral should be aggregated for purposes of the oversecurity determination, each Debtor's interest in the collateral it pledged is undivided. The cumbersome statutory language thus distills to "value of the collateral."

[8] In addition to entitlement to post-petition interest, a § 506(a) determination of secured status triggers several rights and protections for the claimholder. See 4 Collier on Bankruptcy ¶ 506.02 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.) (noting that the holder of a secured claim may be entitled to adequate protection relief, lifting of the automatic bankruptcy stay, and greater protection in cramdown situations). The § 506(a) determination may differ depending on the purpose of the valuation. Here we are concerned solely with valuations for the purpose of determining entitlement to post-petition interest.

-17-

<u>Id.</u> § 506(b).  Thus, if the collateral is worth more than the amount of the secured claim, the creditor is entitled to post-petition interest on its claim[9] up to the amount of the difference in values (this difference is referred to as an "equity cushion" or "security cushion").  <u>See</u> <u>Baybank-Middlesex</u> v. <u>Ralar Distribs., Inc.</u>, 69 F.3d 1200, 1202 (1st Cir. 1995) ("A creditor is oversecured when the value of its collateral exceeds the amount of its [allowed secured] claim; postpetition interest and fees are allowable only to the extent of that oversecurity."); <u>see</u> <u>also</u> <u>Timbers</u>, 484 U.S. at 372 (noting that § 506(b) "permits postpetition interest to be paid only out of the 'security cushion'").  Post-petition interest accrues until the secured claim is paid or until the effective date of the plan.  <u>Rake</u> v. <u>Wade</u>, 508 U.S. 464, 468 (1993), <u>superseded by statute on other grounds</u>, 11 U.S.C. § 1322(e).

The parties agree that Prudential was oversecured during at least part of the bankruptcy proceeding and therefore is

---

[9] Prudential also sought approximately $750,000 in post-petition fees and costs.  The bankruptcy court denied this request, noting that Prudential failed to explain or itemize this amount of fees and costs or to indicate what provision(s) of the relevant contracts provided for them.  The BAP noted that Prudential "did not brief any issues relating to the bankruptcy court's ruling," and deemed the issue waived.  Similarly, here, Prudential refers several times to its entitlement to post-petition costs and fees in its brief, but offers no argument that the bankruptcy court erred.  Like the BAP, we consider this issue waived.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

entitled to some amount of post-petition interest, but they differ as to how to determine oversecured status, when Prudential became oversecured, and the applicable interest rate and type.

### 1.    Determination of Oversecurity

We review the bankruptcy court's interpretation of § 506 de novo, and its factual finding as to when Prudential became oversecured for clear error.  See Hill, 562 F.3d at 32.

### i.    Flexible Versus Single-Valuation Approach

Although § 506(a) dictates how courts should determine secured status and collateral value, it does not specify the time as of which these determinations should be made.[10]  See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 798 (5th Cir. 1997).  Where these figures remain relatively constant, the choice of measuring date may not matter.  But where, as here, the amount of the claim has decreased significantly and the value of the collateral has increased during the course of the bankruptcy, the choice can make the difference between a finding of oversecurity or undersecurity.

---

[10] We recognize that "timing of the valuation" and similar language could be read to refer either to the time the court actually renders the valuation determination or to the value of the collateral at some particular point in time.  For the purposes of this opinion, we use the terms "timing of the valuation" and "measuring date" to refer to the value of collateral as of a particular date, without regard to when the court renders its determination.

Courts have split on the timing issue. Several have adopted a "single-valuation" approach, where the determination of oversecurity for § 506(b) purposes always occurs at a fixed point in time (generally either the petition date or the confirmation date). See, e.g., Orix Credit Alliance, Inc. v. Delta Res., Inc. (In re Delta Res., Inc.), 54 F.3d 722, 729 (11th Cir. 1995) (per curiam) ("[T]he oversecured creditor's allowed secured claim for postpetition interest is limited to the amount that a creditor was oversecured at the time of filing."). Others have adopted a "flexible" approach, giving the bankruptcy court discretion to determine the appropriate measuring date based on the circumstances of the case. See, e.g., T-H New Orleans, 116 F.3d at 798 ("[F]or purposes of determining whether a creditor is entitled to accrue interest under § 506(b) in the circumstance where the collateral's value is increasing and/or the creditor's allowed claim has been or is being reduced by cash collateral payments, such that at some point in time prior to confirmation of the debtor's plan the creditor may become oversecured, valuation of the collateral and the creditor's claim should be flexible and not limited to a single point in time, such as the petition date or confirmation date."). The bankruptcy court provided a thorough review of the split in authority, see In re SW Hotel Venture, LLC, 460 B.R. 4, 27–31 (Bankr. D. Mass. 2011), and we need not repeat it here.

The bankruptcy court and the BAP both adopted the flexible approach, although their applications of it differed. The bankruptcy court found that the hotel sale price provided the best evidence of the hotel's value as of the sale date, but concluded that the sale price was not reflective of its value at any earlier point in time due to the previously outstanding contingencies. The BAP agreed that the sale price was the best evidence of value, but concluded that the sale price established that Prudential was oversecured throughout the pendency of the bankruptcy proceedings.

The Debtors and the City urge us to uphold the bankruptcy court's application of the flexible approach in this case. Prudential's argument is two-pronged. Prudential urges us to adopt a single-valuation approach using the confirmation date as the measuring date, and to hold that, as a matter of law, its oversecurity at confirmation dictates that it receive post-petition interest from the petition date regardless of whether it was undersecured at any point prior to that date.[11] It also argues that, even if the flexible approach were appropriate, the bankruptcy court erred in applying it, and that we should affirm

---

[11] We note that it took opposite positions before the bankruptcy court. In its § 506(b) motion, Prudential explicitly argued that "the appropriate time at which to value the secured creditor's interest in the collateral is . . . flexible," and "to the extent a secured creditor's claim fluctuates between being oversecured and undersecured during the course of a bankruptcy case, the creditor is entitled to accrue post-petition interest during the period which it is oversecured."

the BAP's conclusion that the hotel sale price established that it was oversecured throughout the bankruptcy.

In a helpful amicus brief, the Mortgage Bankers Association ("Mortg. B.A.") argues that the timing of the valuation must, by statute, be tethered to the purpose for which the valuation is made, and that the single valuation approach is overly simplistic because it requires the same measuring date regardless of the purpose of the valuation. However, noting that an open-ended flexible approach could require potentially limitless redeterminations in cases of fluctuating value, it cautions that any rule must avoid serious practical consequences: if the flexible approach provides that a pre-confirmation valuation is not only relevant but also essential to determining creditors' secured status at confirmation, that may unduly burden creditors or, conversely, be used to harass debtors by encouraging aggressive action by creditors. We do not believe our resolution of this case raises those concerns.

We agree with the bankruptcy court and the BAP that, at least in the circumstances presented here, a bankruptcy court may, in its discretion, adopt a flexible approach.

We have previously recognized that the statutory directive to determine collateral's value "in light of the purpose of the valuation and of the proposed disposition or use of such property," § 506(a), affords bankruptcy courts flexibility in

determining the appropriate valuation method, given the particular facts of the case at hand. <u>Winthrop Old Farm</u>, 50 F.3d at 73-74; <u>see</u> <u>also</u> <u>In re Heritage Highgate, Inc.</u>, 679 F.3d 132, 141 (3d Cir. 2012) ("[In the § 506(a) context], Congress envisioned a flexible approach to valuation whereby bankruptcy courts would choose the standard that best fits the circumstances of a particular case."). But we have not yet addressed whether this same flexibility extends to selecting a measuring date. Several considerations convince us that, in appropriate circumstances, it does.

First, neither § 506(b)'s language, nor its legislative history, nor the bankruptcy rules define the measuring date for purposes of post-petition interest, suggesting flexibility. <u>See</u> <u>T-H New Orleans</u>, 116 F.3d at 798. The language of § 506(a) also suggests that Congress intended bankruptcy courts to have flexibility. While § 506(a)(1) sets out a general rule that collateral value "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property," § 506(a)(2) creates an exception to the general rule:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property <u>as of the date of the filing of the petition</u> without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property <u>at the time value is determined</u>.

§ 506(a)(2) (emphasis added). The fact that Congress mandated particular measuring dates in the exception without mandating a particular measuring date in the general rule suggests that it intended flexibility under § 506(a)(1). See Russello v. United States, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration and internal quotation marks omitted); see also In re Urban Communicators PCS Ltd. P'ship, 379 B.R. 232, 243 (Bankr. S.D.N.Y. 2007) ("The statutory guidance appearing as part of section 506(a) is the antithesis of a hard-and-fast rule, and instead embodies a more functional approach."), aff'd in part, rev'd in part on other grounds sub nom. Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P., 394 B.R. 325 (S.D.N.Y. 2008).

Second, the considerations that supported affording flexibility in selecting a valuation method in Winthrop Old Farm apply equally to selecting a valuation time. There, we noted that allowing bankruptcy courts to select the appropriate valuation method on a case-by-case basis "allows the bankruptcy court, using its informed discretion and applying historic principles of equity, to adopt in each case the valuation method that is fairest given the prevailing circumstances." 50 F.3d at 75-76; see also Heritage Highgate, 679 F.3d at 142 n.7 ("Like the appropriate measure of

fair market value, the appropriate time as of which to value collateral may differ depending on the facts presented. As with the replacement valuation technique, bankruptcy courts are best situated to determine when is the appropriate time to value collateral in the first instance.") (citation omitted); T-H New Orleans, 116 F.3d at 798 (noting that a flexible standard "recognizes the discretionary nature of bankruptcy courts as courts of equity . . . [and] the equitable nature of bankruptcy in seeking a balance between debtors and creditors (debtor's right to a fresh start versus the creditor's right to the value of its claim)").

Third, rather than yielding the fairest result, a rigid single-valuation approach guarantees an all-or-nothing result that hinges more on fortuity than reality. For example, if the petition date were the required measuring date, a creditor that first became oversecured even one day later would be allowed no post-petition interest, even though it was oversecured throughout almost the entire bankruptcy and even though it could receive substantial post-petition interest under a flexible approach. Conversely, if the confirmation date were the required measuring date, a creditor that first became oversecured just one day earlier would be allowed post-petition interest for the entirety of the bankruptcy proceeding (up to the amount of the equity cushion).[12] We do not

_____

[12] This case well demonstrates the problem with Prudential's proposed single-valuation-at-confirmation approach. As will be discussed below, Prudential only became oversecured as a result of

-25-

believe that Congress intended entitlement to post-petition interest to depend so heavily on chance. Nor do we believe that Congress intended to restrict the bankruptcy courts' equitable discretion without explicitly saying so. The availability of a flexible approach strikes us as more likely to produce fair outcomes than allowing post-petition interest for the entire bankruptcy, or not at all, based on a rigidly defined one-shot vantage point.

In support of its argument that the confirmation date must be the measuring date, Prudential notes that the collateral value must be calculated at confirmation because, by definition, the estate can only distribute what value the debtors actually have at that time. Thus, its entitlement to post-petition interest (or, more precisely, whether its receipt of post-petition interest to which it would otherwise be entitled will be limited because the equity cushion is insufficient to cover it) can only be known at confirmation. Similarly, the existence and extent of oversecurity can only be conclusively determined once the amount of any recovery under § 506(c) is known, which also, by necessity, is at confirmation. These considerations explain why a creditor does not

the Debtors' continued efforts to complete the W project and continue selling condominium units -- successful efforts that were funded in large part by a cash infusion made by the City. Equity does not require that a senior secured creditor be allowed to vacuum up all the upside of appreciation of its collateral where that appreciation was only realized due to funding provided by a junior creditor.

receive accrued post-petition interest until confirmation.  See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.), 793 F.2d 1380, 1407 (5th Cir. 1986).  But we see nothing incongruous about finding that a creditor became entitled to post-petition interest at one point in the proceedings and determining whether that interest will be limited by the size of the equity cushion at a different point (namely, the time of confirmation).  See T-H New Orleans, 116 F.3d at 799 ("[A] secured creditor's entitlement to accrue interest under § 506(b) matures at that point in time where the creditor's claim becomes oversecured.  However, as Timbers dictates, accrued interest under § 506(b) is not paid to an oversecured creditor until the plan's confirmation or its effective date, whichever is later.") (footnote omitted).

For these reasons, we hold that, under the particular facts presented in this case, the bankruptcy court did not err in adopting a flexible approach for determining oversecured status.[13]

_____

[13] We do not suggest that bankruptcy courts must, or even should, adopt the flexible approach whenever collateral values and/or claim amounts fluctuate.  We simply recognize that a bankruptcy court may, in the exercise of its discretion, determine that, on the particular facts before it, equity and fairness would be best served by application of a flexible approach.

### ii.   Application of the Flexible Approach

### a.   Standard of Review

The bankruptcy court determined that Prudential became oversecured as of the date the hotel sale closed and was entitled to post-petition interest from that date through the effective date.  Although this is a factual determination to which the clear-error standard would normally apply, cf. Baybank-Middlesex, 69 F.3d at 1203 (reviewing for clear error a determination that the creditor was undersecured for adequate-protection purposes), Prudential argues that that standard is inappropriate here because the bankruptcy court's factual determination was infected by legal error, see Winthrop Old Farm, 50 F.3d at 73, in that the bankruptcy court wrongly elevated Prudential's burden of proof in establishing oversecurity.  We find no such error.

The parties agree that, ultimately, the burden was on Prudential to show by a preponderance of the evidence that it was oversecured,[14] but Prudential argues that the bankruptcy court erred

---

[14] Prudential advocates for a burden-shifting approach by which its burden was not triggered unless and until the Debtors refuted the presumed validity of its proof of claim by introducing sufficient evidence that the collateral was worth less than the amount of the secured claim plus interest. See Heritage Highgate, 679 F.3d at 139–40, 145 (discussing varied approaches, and adopting a burden-shifting framework for determining the extent to which a claim is secured under § 506(a)).  Regardless of the merits of this approach, Prudential did not request its application below and did not challenge the Debtors' citation to a long string of cases holding that the creditor bears the burden of establishing oversecured status.  See, e.g., T-H New Orleans, 116 F.3d at 798 (holding that, although the burden to motion for a § 506(b)

in holding it to a much higher standard.  In ruling that the sale closing date was the appropriate time to fix Prudential's oversecured status, the bankruptcy court stated that, "[o]n that date, it was unequivocally established and beyond dispute that Prudential was an oversecured creditor."  SW Hotel Venture, 460 B.R. at 32.  We do not agree with Prudential that this passage means that the bankruptcy court replaced the preponderance standard with a newly created "unequivocal and beyond dispute" standard. The bankruptcy court correctly recited the preponderance standard three separate times in its comprehensive § 506(b) ruling.  We read the "beyond dispute" language as a comment on the certainty of the oversecurity finding, and see absolutely nothing in the bankruptcy court's reasoning or conclusions to suggest that it was applying anything other than the correct standard.  Because the bankruptcy

---

determination lies with whichever party contends that there is a dispute about entitlement to post-petition interest, "[t]he creditor . . . bears the ultimate burden to prove by a preponderance of evidence its entitlement to postpetition interest, that is, that its claim was oversecured, to what extent, and for what period of time").  The Debtors can hardly be faulted for purportedly failing to make a showing that no binding precedent required that they make and that they were never asked to make.

In addition, Prudential apparently failed to submit copies of the relevant documentation (the note, mortgage, and CLA) along with its proof of claim, despite the proof-of-claim form's specific instructions to do so and contrary to the requirements of Bankruptcy Rule 3001.  Therefore, even if the burden-shifting approach had applied, it is highly questionable whether Prudential was entitled to the presumed validity that attaches to a "proof of claim executed and filed in accordance with [Rule 3001]," Fed. R. Bankr. P. 3001(f).

court's analysis was not infected by legal error, the clear-error standard applies.

### b. Measuring Date

The bankruptcy court considered several possible measuring dates (the petition date, the date of the lift-stay decision, the date SW Boston signed the hotel P&S and filed its motion for approval of the sale, the date the court approved the sale motion, the hotel sale date, and the date of the confirmation hearing), and determined that the sale closing date was the earliest that Prudential had established oversecured status.[15]

As for the petition date, the court noted that Prudential had submitted no evidence that it was oversecured at that time, and that it instead relied on the Debtors' schedules of assets, which indicated that the value of Prudential's collateral, in the aggregate, was substantially more than its total pre-petition claim. As Prudential points out, these schedules were completed under penalty of perjury. But, as the Debtors point out, the schedules also specifically indicated that the listed values were book values that may not reflect the fair market value of the

_____

[15] The bankruptcy court relied on stipulated values for the remaining condominiums and other collateral. These values are not disputed on appeal. The parties likewise stipulated to the method for calculating Prudential's claim, in light of the ongoing condominium sales and application of those proceeds to Prudential's claim. The only real factual dispute is with respect to the hotel's value over time, culminating in its final sale price of $89.5 million.

Debtors' interest in the relevant property.  See Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 36 (2d Cir. 1996) ("[B]ook values are not ordinarily an accurate reflection of the market value of an asset.").  The bankruptcy court did not rely on these values because they were not substantiated by any evidence.  We perceive no error, clear or otherwise.

As for the lift-stay decision, the Debtors correctly note that the main issue there was whether the W was necessary to an effective reorganization.  The Bankruptcy Code provides that the bankruptcy court "shall grant relief from the stay" of an act against property if:

> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).[16]  SW Boston conceded that it did not have equity in its assets alone, and the bankruptcy court rejected its argument that the combined collateral pledged by all of the Debtors

---

[16] In its lift-stay motion, Prudential also moved for relief under § 362(d)(1) (granting relief from a stay "for cause, including the lack of adequate protection of an interest in property of such party in interest"), but appears to have abandoned that ground in its post-trial briefing.  The bankruptcy court considered it anyway, and determined that Prudential had failed to show cause for relief because: (1) it produced no evidence that it was not adequately protected and failed to address it in its brief; (2) it had an equity cushion of $19 million when its remaining claim was compared to the entire collateral package; (3) SW Boston was reducing the amount owed to Prudential through condominium sale proceeds; and (4) the value of its secured claim was not declining.

should be considered in determining whether it had equity under § 362(d)(2)(A). See In re SW Bos. Hotel Venture LLC, 449 B.R. 156, 177–78 (Bankr. D. Mass. 2011) (discussing split of authority, determining that all liens, including the City's, should be compared only to the value of the property that was the subject of the creditor's lift-stay request, and noting that consideration of other collateral is relevant for other purposes, including § 362(d)(1) and (2)(B)). Thus, the primary question was whether an effective reorganization was in prospect and, if so, whether the W was necessary to that reorganization. See 11 U.S.C. § 362(d)(2)(B). After a detailed evaluation of each side's evidence and expert testimony, the court concluded that SW Boston was "making sufficient progress towards a realistic goal such that its efforts should be allowed to continue without the threat of foreclosure by Prudential." SW Bos. Hotel Venture, 449 B.R. at 182. It thus denied Prudential's motion for relief from the stay.

Pointing to the bankruptcy court's finding that, although Prudential was undersecured as to SW Boston alone, it was oversecured by approximately $19 million when all of the Debtors' collateral was considered in the aggregate, Prudential argues that, under Baybank-Middlesex, the bankruptcy court's subsequent "dismiss[al]" or "disregard" of this earlier finding is "a practice not countenanced" in this circuit. Prudential misstates both the facts of the case and the relevant law.

First, the bankruptcy court did not dismiss or disregard its earlier findings; instead, it surveyed the entire lifespan of the case, incorporating subsequent developments into its analysis of the earlier valuation, and determined that Prudential had not met its burden of showing oversecurity for § 506(b) purposes at any time before the sale date. The bankruptcy court did not simply ignore its earlier valuation; it explicitly considered its earlier valuation and explained in detail why that valuation did not control. And, as we will discuss below, that determination was not clearly erroneous.

Second, while Baybank-Middlesex noted that a valuation made at an adequate-protection hearing was not dicta, as the valuation was a factual finding that constituted a "logical step in making an adequate protection determination," 69 F.3d at 1203, it plainly does not require an earlier valuation for one purpose to be binding for some other purpose. Nor would such a requirement square with the statutory directive that collateral's value "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a). We have not expressly ruled on the question, but other courts have generally held that a valuation at one point in the proceedings has no binding effect on valuations performed at other points and for

other purposes.[17]  See, e.g., Norwest Bank Worthington v. Ahlers (In re Ahlers), 794 F.2d 388, 398 (8th Cir. 1986) ("An initial valuation for adequate protection purposes is not res judicata for purposes of determining the value of the collateral, and thus the allowed secured claims of the creditors, under a reorganization plan."), rev'd on other grounds, 485 U.S. 197 (1988); 4 Collier on Bankruptcy ¶ 506.03[7][g] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.) ("The need to look to the purpose of the valuation appears to have achieved virtually universal acceptance.  Hence, courts generally agree that a valuation determination in one context will not have res judicata or collateral estoppel effect with respect to a different valuation hearing in a different context within the same case.").  We now hold, as have other courts, that a valuation made for one purpose at one point in a bankruptcy proceeding has no binding effect on valuations performed for other purposes at other points in the proceeding.

Prudential next argues that the sale price is the best evidence of the hotel's value, and that that price necessarily established that it was oversecured throughout the bankruptcy proceedings.  Courts have routinely held that "so long as the sale

---

[17]  In Baybank-Middlesex, we indicated agreement with that proposition, but were not presented with the issue because the creditor "might have argued, but did not, that even a valid finding as to collateral value made at an adequate protection hearing has no res judicata effect when valuations are to be made for other purposes at later proceedings."  69 F.3d at 1203 n.5.

price is fair and is the result of an arm's-length transaction, courts should use the sale price, not some earlier hypothetical valuation, to determine whether a creditor is oversecured and thus entitled to postpetition interest under § 506(b)."  Dobbins, 35 F.3d at 870; see also Takisaki v. Alpine Grp., Inc. (In re Alpine Grp., Inc.), 151 B.R. 931, 935–36 (B.A.P. 9th Cir. 1993).  We have no quibble with the proposition that an arm's-length sale generally provides better evidence of value at a given time than does an appraisal of its value at that same time.  But that does not mean that a sale price at one time necessarily establishes the collateral's value at some other time.  Where the value of collateral is changing, a one-size-fits-all valuation poorly reflects that reality.

Here, the bankruptcy court did note that the price obtained at the arm's-length sale provided the best indicator of the hotel's value, and it acknowledged that the price ($89.5 million) strongly suggested that the appraised values relied upon at the lift-stay hearing ($55 million and $65.6 million) were conservative, supporting Prudential's argument that it was oversecured at least as of the appraisal dates.  However, the bankruptcy court went on to note that several contingencies "could have derailed the sale," even after it granted the hotel sale motion (about two weeks before the actual sale).  It held that it was only when the last improvements were completed, all outstanding

-35-

contingencies were resolved (including resolving issues with the Starwood contract, a contingency that Prudential itself described as "an essential element to the success of the [W]"), and the sale actually closed that the sale price accurately reflected its value. The court thus found that Prudential had not shown that it was oversecured as of the date SW Boston signed the hotel P&S or the date the court approved the sale motion.[18]  It seems plausible that Prudential's declining claim and the hotel's increasing value may have crossed paths at some point before the hotel closing date, but Prudential did not meet its burden to establish when that cross-over may have occurred.  On this record, we cannot say that the bankruptcy court clearly erred in determining when Prudential became oversecured.

The BAP held that the bankruptcy court erred in not applying the sale price to the entirety of the bankruptcy proceeding based on its view of the reasoning in Urban Communicators, 379 B.R. at 243–44.  We are unpersuaded that the reasoning in Urban Communicators leads to the outcome Prudential seeks.  There, the secured creditor loaned funds to the debtors for the purchase of radio wave spectrum licenses.  During a subsequent bankruptcy, the Federal Communications Commission cancelled the

---

[18] Having found that Prudential was oversecured as of the sale date, and in light of the parties' agreement that Prudential was oversecured as of the confirmation date, the bankruptcy court did not separately consider using the confirmation date as the measuring date.

debtors' licenses -- unlawfully so, as litigation between the FCC and a different license-holder would later make clear. Id. at 238. After the FCC "effectively und[id] its cancellation or attempted cancellation" of the debtors' licenses, id. at 239, the debtors sold them, with the sale price establishing that the creditor was oversecured, id. at 239–240. However, the debtors argued that, at least during the five-year cancellation period, the collateral package was worth significantly less and the creditor was undersecured. Id. at 204–41. The court disagreed, noting that, in addition to the licenses themselves, the creditor's lien attached to proceeds from the sale of the licenses, the debtors' litigation rights against the FCC, and capital stock of the debtors' subsidiaries. Id. at 244. The court determined that the sale price actually did reflect the collateral's earlier value, as the debtors had "maintained litigation rights against the FCC for this wrongful cancellation, whose value is now apparent." Id. Thus, even though it may have been uncertain for a time whether the licenses could eventually be sold and the proceeds turned over to the creditor, subsequent events made clear that the collateral package -- including litigation rights -- always was sufficient to render the creditor oversecured. This is plainly distinguishable from the situation here, where the actual value of the hotel increased over time. To the extent that one can read Urban Communicators to hold that a sale price automatically and always

relates back to the petition date regardless of intervening events -- and we doubt very much that it can be so read, see id. at 243 (noting that, even under the flexible approach, courts should generally use the sale price as "the best available evidence of collateral value except where the circumstances dictate a different approach") (emphasis added) -- we disagree with it.

In addition, in rejecting the bankruptcy court's factual determination, the BAP utterly ignored both the relevant clear-error standard and the bankruptcy court's reliance on the improvements and contingencies that, in its estimation, rendered the eventual sale price a poor indicator of earlier value.

### 2.    Computation of Interest

Having established that the bankruptcy court did not clearly err in determining when Prudential's post-petition interest began to accrue, we now turn to two questions regarding how that interest accrued: at what rate, and whether the interest is simple or compound.

Section 506(b) does not specify how to compute post-petition interest.  The Supreme Court, construing § 506(b), has held that the phrase "provided for under the agreement or State statute under which such claim arose" modifies only "reasonable fees, costs, or charges," and not "interest on such claim." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989).  Thus, the statutory language does not dictate that bankruptcy courts look

to the applicable contract provisions, if any, when computing post-petition interest.  However, courts are largely in agreement that, although the "appropriate rate of pendency interest is . . . within the limited discretion of the court," Key Bank Nat'l Ass'n v. Milham (In re Milham), 141 F.3d 420, 423 (2d Cir. 1998), where the parties have contractually agreed to interest terms, those terms should presumptively apply so long as they are enforceable under state law and equitable considerations do not dictate otherwise, see, e.g., Gen. Electric Capital Corp. v. Future Media Prods. Inc., 536 F.3d 969, 974 (9th Cir. 2008) (adopting the rule "adopted by the majority of federal courts" that the "bankruptcy court should apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law") (internal quotation marks omitted); In re Terry Ltd. P'ship, 27 F.3d 241, 243 (7th Cir. 1994) ("What emerges from the post-Ron Pair decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations."); 4 Collier on Bankruptcy ¶ 506.04[2][b] (stating that interest, including allowance of contractual default rate and compounding, should be determined by reference to applicable nonbankruptcy law).  As the General Electric Capital court noted, enforcing the contract is consistent with the general premise that "creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's

obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." 536 F.3d at 973 (alteration omitted) (quoting Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Electric Co., 549 U.S. 443, 450 (2007)) (internal quotation marks omitted); see also In re Lapiana, 909 F.2d 221, 223 (7th Cir. 1990) ("[B]ankruptcy, despite its equity pedigree, is a procedure for enforcing pre-bankruptcy entitlements under specified terms and conditions rather than a flight of redistributive fancy . . . .").

### i. Interest Rate

The bankruptcy court and the BAP both held that Prudential was entitled to interest at 14.5%, the default rate specified in the CLA.[19] There is no dispute that SW Boston defaulted under the terms of the CLA. However, the Debtors argue that the bankruptcy court erred by considering the enforceability of the default rate only under federal law, when what was required was a two-step analysis, first focusing on its enforceability under Massachusetts law[20] before turning to federal law. While the above

---

[19] Section 2.3.3 of the CLA provides: "In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by applicable Legal Requirements, overdue interest in respect of the Loan, shall accrue interest at the Default Rate . . . ." The Default Rate is defined as "a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Applicable Interest Rate." The Applicable Interest Rate, in turn, is defined as "9.50% per annum, compounding monthly."

[20] The parties agree that the contract is governed by Massachusetts law.

analysis suggests that, in all cases, the presumption in favor of applying a contractual interest provision can be rebutted by showing that is unenforceable under state law, we need not reach that issue today. Here, the CLA's default interest provision directs the court's inquiry to Massachusetts law, as the rate is limited to the lesser of the default rate or the "maximum rate permitted by applicable law." However, we do not believe that the Debtors have shown that the default rate exceeds that threshold.

Under Massachusetts law, the court must determine whether the default interest provision constitutes allowable liquidated damages or an unenforceable penalty. See OneUnited Bank v. Charles St. African Methodist Episcopal Church of Bos., 501 B.R. 1, 10 (D. Mass. 2013). The party challenging a liquidated damages provision bears the burden of showing that it constitutes an unenforceable penalty, and all reasonable doubts are resolved in favor of enforcement. See NPS, LLC v. Minihane, 886 N.E.2d 670, 673 (Mass. 2008). A liquidated damages provision will be enforced provided, "first, that at the time of contracting the actual damages flowing from a breach were difficult to ascertain; and second, that the sum agreed on as liquidated damages represents a reasonable forecast of damages expected to occur in the event of a breach." Id. (internal quotation marks omitted). It was the Debtors' "burden to show that the amount of liquidated damages [was] unreasonably and grossly disproportionate to the real damages from a breach or

unconscionably excessive."  Id. at 421 (internal quotation marks omitted).

Here, the Debtors established only that Joanna Mulford, a Vice President of Prudential, did not personally engage in any analysis of Prudential's anticipated damages in the event of a breach, nor was she aware of whether anyone else had done so.  If the burden had been on Prudential to establish the enforceability of default interest, perhaps this analysis would come out differently.  As it is, however, this partial admission does not discharge the Debtors' burden to show that the default rate was not reasonably related to anticipated damages and, in fact, was so grossly disproportionate to anticipated damages or otherwise unconscionable as to be unenforceable under Massachusetts law.

We also find no error in the bankruptcy court's analysis under federal equitable principles.  After discussing and applying factors that bankruptcy courts have used in balancing the equities, see In re Gen. Growth Props., Inc., No. 09-11977, 2011 WL 2974305, at *4 (Bankr. S.D.N.Y. July 20, 2011) (setting out four-factor test); In re Jack Kline Co., 440 B.R. 712, 745–46 (Bankr. S.D. Tex. 2010) (setting out seven-factor test, plus additional catch-all factor), the court determined that application of the default rate would not be inequitable.  Specifically, the court noted that: (1) other creditors would not be harmed because the plan contemplated payment of all creditors in full; (2) although Prudential was quite

litigious, "raising multiple objections to virtually every motion made by the Debtors," SW Hotel Venture, 460 B.R. at 36, its conduct did not rise to the level of obstruction of the bankruptcy process or other misconduct; (3) the Debtors did not rebut Prudential's evidence that the CLA's default rate was consistent with default rates of similar loans in the market, including where Prudential was either the lender or the borrower; and (4) courts have approved larger spreads between base and default interest rates. We find no error in the bankruptcy court's conclusion that the Debtors had failed to rebut the presumption in favor of enforcing the contractual provision.[21]

---

[21] The Debtors also submit that, under § 506(b), default interest is actually a "fee" or "charge" (to which the "reasonable" modifier does apply) rather than interest (to which it does not). They have some support for this characterization. See In re AE Hotel Venture, 321 B.R. 209, 215 (Bankr. N.D. Ill. 2005) (treating default interest as a charge because, "[g]enerally speaking, interest compensates for the delay in receiving money owed: the loss of the time value of money. [The creditor] arrived at the interest rate it believed would compensate for that loss in the Note: a rate of 9.72%. That being so, the difference between the original rate and the 14.72% default rate -- a difference of 5% -- could not have been meant to perform the usual function of interest. The time value of [the creditor's] money, after all, did not magically increase by 5% once [the debtor] defaulted.") (citations and internal quotation marks omitted); Fischer Enters., Inc. v. Geremia (In re Kalian), 178 B.R. 308, 313-14 (Bankr. D.R.I. 1995) ("Labeling a contract term an interest provision does not make it so. If, though labeled interest, it exacts a penalty or sets liquidated damages in an impermissible manner, it will not be enforced. Moreover, if the term is really a 'charge,' § 506(b) requires that it be reasonable. The parties may not insulate it from scrutiny by affixing the 'interest' label.") (footnotes omitted). But see Hepner v. PWP Golden Eagle Tree, LLC (In re K & J Props., Inc.), 338 B.R. 450, 458 (Bankr. D. Colo. 2005) ("The [AE Hotel Venture] court maintains that pre-default interest

-43-

## ii.  Compound Versus Simple Interest

Prudential argues that it is entitled to accrue post-petition interest at the default rate, compounding monthly.  The bankruptcy court held that it was not entitled to compound interest, and the BAP reversed.

As noted above, the CLA defines "Applicable Interest Rate" as "9.50% per annum, compounding monthly," and the "Default Rate" as "a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Applicable Interest Rate."  The bankruptcy court, however, erroneously stated that the CLA "does not provide for compound interest either at the default rate or the non-default rate of interest."  Noting that compound interest is disfavored by Massachusetts law absent an express agreement to the contrary, see, e.g., Inhabitants of Tisbury v. Vineyard Haven Water Co., 79 N.E. 256, 257 (Mass. 1906), the court ruled that Prudential was not entitled to compound interest.

---

compensates for the time value of money, but post-default interest does not; it represents some other 'charge,' and thus, must be reasonable under section 506(b).  This is a distinction without a difference.  Pre and post-default interest rates are simply matters of pricing.  The money costs more if not repaid when agreed.  Had Congress wished to distinguish between the treatment of pre and post-default interest by section 506(b), it could easily enough have said so.").  We need not answer the question, because, even if the reasonableness limitation applies, for largely the same reasons enunciated in the equity analysis, we see no reason to dislodge the bankruptcy court's finding that the default interest rate was not unreasonable.

Recognizing that the above-quoted provision <u>does</u> expressly call for monthly compounding of interest, the Debtors seek to introduce ambiguity by pointing to other provisions of the contract that appear to imply that interest will be simple. We need not delve into the ambiguity question because we find that Prudential cannot claim entitlement to compounding where it -- whether by inadvertence or in an attempt to sandbag the Debtors and mislead the bankruptcy court we cannot say -- did not seek compound interest until after the bankruptcy court granted it post-petition interest at the default rate running from the hotel sale date. In its brief, Prudential cited Section 1.1 of the CLA for the propositions that the Applicable Interest Rate "is defined to mean 9.50% per annum" -- with no mention of compounding -- and the Default Rate is defined to mean the applicable rate plus 5%.[22] <u>See</u> <u>Berman</u> v. <u>B.C. Assocs.</u>, 219 F.3d 48, 50 (1st Cir. 2000) ("[T]he overwhelming majority of Massachusetts cases equate an interest rate 'per annum,' whether in a contract or a statute, with simple interest."). Prudential also presented, via Mulford's affidavit and testimony, its calculation of interest at the base and default rates, and referred simply to 9.5% versus 14.5% interest, again without mentioning compounding. As the BAP and the bankruptcy court noted, Mulford did not explain how she actually performed the

---

[22] Prudential also used identical language in its objection to confirmation of the plan, filed just three days before the combined trial began.

calculation. Prudential's expert witness, Marti Murray, testified that she calculated post-petition interest at the default rate of 14.5%, but also made no mention of compounding. Indeed, throughout the § 506(b) briefing and a three-day trial, the singular mention of a contractual entitlement to compound interest was on one page of Murray's expert report.

The bankruptcy court granted Prudential post-petition interest from the hotel sale date at 14.5% based upon its consideration of the equities of the situation in light of what Prudential purported to request. Only after securing that order did Prudential assert an entitlement to compound interest.[23] We do not believe that Prudential, having failed to give the bankruptcy court the opportunity to consider whether application of compound interest (even if the contract called for it) would have been equitable, can now be heard to complain that the court abused its discretion (or even erred) in disallowing compounding.

---

[23] In its § 506(b) order, the bankruptcy court directed the parties to submit an agreed order itemizing the amount of default interest, or, if they could not agree, to submit separate proposed orders. The parties apparently could not agree and submitted separate orders, with the only difference being whether the loan should accrue compound interest. The proposed orders are not part of the record on appeal and do not appear on the bankruptcy court docket. We thus cannot determine whether Prudential, even at that late date, directed the bankruptcy court's attention to the exact wording of Section 1.1. In any event, even if it did, the court would have been entirely within its discretion to hold that Prudential had forfeited the argument.

For all of these reasons, we affirm the bankruptcy court's holding that Prudential is entitled to post-petition interest accruing from the hotel sale date at the default rate of 14.5% without compounding, and reverse the BAP's § 506(b) order to the extent it conflicts.[24]

## C.     Confirmation Order

Prudential moved to dismiss the City's and the Debtors' appeals from the BAP's order vacating and remanding the bankruptcy court's confirmation order, arguing that this court lacked jurisdiction to review the BAP's order because it was not a final order within the meaning of 28 U.S.C. § 158(d) (providing that "courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered" by BAP panels or district courts sitting in an intermediate appellate capacity with respect to bankruptcy court orders).

---

[24] The Debtors argue that only SW Boston's collateral should be considered when determining both whether and when Prudential was oversecured and the size of the resulting equity cushion out of which any post-petition interest must be paid.  Prudential argues first that the Debtors waived this argument by not listing it in their statement of issues to be presented.  See Fed. R. Bankr. P. 8006.  Prudential also disagrees on the merits, contending that, especially in light of the merger of the Debtors for payment purposes under the plan, it is appropriate to aggregate all Debtors' collateral for both purposes.  We need not resolve the issue because the Debtors concede that, as of the combined trial date, Prudential was oversecured as to SW Boston alone by an amount sufficient to cover the post-petition interest as calculated by the bankruptcy court (and as affirmed by this court).

The BAP noted that its § 506(b) order resulted in a large increase in the amount of Prudential's claim, and thus affected the evaluation of the plan under 11 U.S.C. § 1129. On that basis, the BAP vacated the confirmation order to "afford the Debtors an opportunity to amend the [p]lan's terms to account for the increased amount of Prudential's claim and the resulting pay out to Prudential and/or for the bankruptcy court to fashion alternative forms of relief for Prudential that would not unravel the reorganization." In re SW Bos. Hotel Venture, LLC, No. 11-087, 2012 WL 4513869, at *3 (B.A.P. 1st Cir. Oct. 1, 2012). Prudential argues that, because this order required significant further proceedings in the bankruptcy court, it cannot have been a final order subject to this court's jurisdiction.

"[B]ecause bankruptcy cases typically involve numerous controversies bearing only a slight relationship to each other, 'finality' is given a flexible interpretation in bankruptcy." Bourne v. Northwood Props., LLC (In re Northwood Props., LLC), 509 F.3d 15, 21 (1st Cir. 2007) (internal quotation marks omitted). A bankruptcy court order may be final even if does not resolve all issues in the case, "but it must finally dispose of all the issues pertaining to a discrete dispute within the larger proceeding." Perry v. First Citizens Fed. Credit Union (In re Perry), 391 F.3d 282, 285 (1st Cir. 2004). In this circuit, "when a district court remands a matter to the bankruptcy court for significant further

proceedings, there is no final order for purposes of § 158(d) and the court of appeals lacks jurisdiction." In re Gould & Eberhardt Gear Mach. Corp., 852 F.2d 26, 29 (1st Cir. 1988). However, "[w]hen a remand leaves only ministerial proceedings, for example, computation of amounts according to established formulae, then the remand may be considered final." Id. There is no question that the bankruptcy court's § 506(b) and confirmation orders were final, nor is there any question that the BAP's § 506(b) order was final.

We are presented here with an unusual case, where the BAP's remand order did contemplate significant proceedings in the bankruptcy court, but did so based solely on its erroneous rulings as to the measuring date and the compounding of interest. In light of our reinstatement of the bankruptcy court's § 506(b) order, the entire basis of the remand has been eviscerated, and effectuating this court's opinion with respect to § 506(b) entails no further proceedings in the bankruptcy court. Nor would our consideration of the remand order risk the "piecemeal appellate review" that the finality rule seeks to prevent. Northwood Props., 509 F.3d at 21. It would be entirely illogical to leave the remand order in place, thereby vacating the confirmation order on a now-rejected basis, to be followed, presumably, by immediate reinstatement of the plan as originally confirmed.[25] As the Debtors note, the confirmation and

_____

[25] One could predict that, in such a scenario, Prudential would then seek to continue its accrual of post-petition interest up through the new effective date, thus adding more than two years of

-49-

§ 506(b) orders were "inextricably linked,"[26] first in the bankruptcy court but especially before the BAP. While the bankruptcy court's confirmation order considered a broad array of issues beyond post-petition interest, the BAP's remand order necessarily flowed directly and exclusively from its § 506(b) order. Especially because the remand order considered none of Prudential's objections to the confirmability of the plan, we think it fair to say that the remand order was part and parcel of the discrete dispute actually ruled on by the BAP.[27] What is more, during the course of this appeal, the Debtors have paid off the entirety of Prudential's claim (including post-petition interest as calculated pursuant to the bankruptcy court's § 506(b) order), rendering moot Prudential's many objections to the confirmation order.

---

interest to its claim. This would seem a wholly inappropriate outcome in light of the facts that the bankruptcy court did not clearly err in its § 506(b) order and that Prudential's corresponding claim has been paid in full (not accounting for additional post-petition interest accruing after the original effective date).

[26] Indeed, in opposing the Debtors' equitable mootness motions before the BAP, Prudential argued that its failure to separately seek a stay of the § 506(b) order when it sought a stay of the confirmation order should not weigh against a finding of equitable mootness, agreeing with the Debtors that the two orders were "inextricably intertwined" and "all part of a whole."

[27] Given our conclusion as to the BAP's § 506(b) order, we need not decide whether the contractual assignment of the City's voting rights to Prudential in bankruptcy proceedings was valid.

In these circumstances, we believe that the Supreme Court's instruction that "the requirement of finality is to be given a practical rather than a technical construction," Gillespie v. U.S. Steel Corp., 379 U.S. 148, 152 (1964) (internal quotation marks omitted), is best effectuated by exercising jurisdiction over both of the BAP's orders.  And, because the BAP's remand order was premised entirely on its mistaken § 506(b) order, we vacate the remand order.

### III.  Conclusion

For the foregoing reasons, we vacate the BAP's § 506(b) and confirmation orders and remand to that tribunal with instructions that it affirm the bankruptcy court's § 506(b) and confirmation orders and remand the case there for further proceedings consistent with this opinion.  All parties shall bear their own costs on appeal.

So ordered.